James BREWER, Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 678 S 119.

Supreme Court of Indiana.

March 6, 1981.

Dennis R. Kramer, Crown Point, for defendant-appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Thomas D. Quigley, Palmer K. Ward, Deputy Attys. Gen., Indianapolis, for plaintiff-appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted in a trial by jury of Murder, in that he knowingly or intentionally killed Stephen Skirpan. Ind. Code § 35–42–1–1 (Burns 1979). Following a sentencing hearing thereafter held before the same jury, it was determined that said murder was committed by Defendant while committing or attempting to commit a robbery, and a sentence of death was recommended and thereafter decreed by the court. Ind.Code § 35–50–2–9 (Burns .1979).

This direct appeal challenges both the legality of the defendant's conviction and the legality of the sentence and presents the following issues:

(1) Whether the verdict was sustained by sufficient evidence.

(2) Whether the trial court erred in admitting evidence of other criminal activity by the defendant.

(3) Whether our death sentence statute violates constitutional proscriptions in any of the following respects:

(A) As a transgression of Article I, Section 18 of the Constitution of Indiana providing that the penal code shall be founded on the principles of reformation and not vindictive justice.

(B) In failing to provide the parameters of the review of the sentence required by this Court.

(C) As permitting the imposition of the death penalty against one convicted under a theory of vicarious liability, hence allowing punishment that is cruel and unusual, and not proportioned to the crime.

(4) Whether the finding of an aggravating circumstance, prerequisite to the imposition of the death sentence, was sustained by sufficient evidence.

(5) Whether the charging requirements of the death penalty statute were complied with.

(6) Whether the court erred in denying Defendant's motion for a continuance of the sentencing hearing.

(7) Whether the defendant's rights against compulsory self-incrimination were violated at the sentencing hearing.

(8) Whether the defendant was denied the effective assistance of counsel at the sentencing hearing.

(9) Whether the defendant had been denied access to the report of a psychologist who had examined the defendant, pursuant to a *sua sponte* order of the court made following the return of the jury's death penalty recommendation.

(10) Whether the trial court erred in advising the jury, during deliberations following the sentencing hearing, concerning parole possibilities concomitant to a prison term.

(11) Whether Defendant's death sentence is an unconstitutional application of the death penalty statute, as excessive and irrational, hence cruel and unusual, when compared with the sentence of sixty (60) years imprisonment awarded to the accomplice, Brooks.

\*   \*   \*   \*   \*   \*

## ISSUE I

In the late afternoon of December 4, 1977, the decedent Stephen Skirpan, a young man, was at home with his parents, Mr. and Mrs. John Skirpan, and his cousin, Joyce Matthews. At approximately 5:00 p.m., the front door bell rang, and he responded. Mr. Skirpan was then summoned by the decedent, who said that two detectives wanted to speak with him. The callers were two well-dressed, youthful looking black men, the defendant and Kenneth Brooks. They stood in the doorway and displayed a badge and announced that they were investigating a traffic accident in which one of the Skirpan automobiles had been involved. Mr. Skirpan advised the callers that their automobiles were parked in front of the house, had been there all day and that they could look at them. One of the callers responded that they had a search warrant, and Mr. Skirpan asked to see it. With that, the defendant, who was standing behind Brooks began to move and exclaimed, "This is a hold up!" Brooks

pushed Mr. Skirpan aside and drew a handgun. Simultaneously, a shot was fired, and Stephen fell to the floor. Brooks then held Mr. Spirpan at bay with his gun, while the defendant, who was also armed with a drawn handgun, stepped into the house. Both Brooks and the defendant entered the house.

The defendant and Brooks held Mr. and Mrs. Skirpan and Joyce at gunpoint and demanded money. Mrs. Skirpan said that the money was in the bedroom, and the defendant went to look for it. Meanwhile, Brooks took money from Mr. Skirpan and searched Mrs. Skirpan's person, herded her, Mr. Skirpan and Joyce into the bathroom, closed the door and ordered them to remain there for ten minutes.

After approximately one minute inside the bathroom, the Skirpans and Joyce emerged and found that their assailants had departed. The entire episode had lasted seven to ten minutes. Mrs. Skirpan rushed to a neighbor's house for help, and as she did, she saw a dark blue sedan depart from the area. Joyce summoned an ambulance, but when it arrived, Stephen was dead.

The defendant's claim of insufficiency of the evidence is addressed to the absence of medical evidence of the cause of Stephen's death, the alleged absence of evidence placing him at the scene of the crime and the absence of evidence identifying him as the one who shot Stephen.

■ Circumstantial evidence alone may support a conviction, so long as a reasonable man could find each element of the crime therefrom, beyond a reasonable doubt. *Jackson v. State*, (1980) Ind., 402 N.E.2d 947; *Ruetz v. State*, (1978) 268 Ind. 42, 373 N.E.2d 152, *cert. denied*, 439 U.S. 897, 99 S.Ct. 261, 58 L.Ed.2d 245.

■ With respect to the evidence of the cause of decedent's death, we have heretofore held that medical testimony is not a prerequisite to establishing the cause of death in a murder case. *Hall v. State*, (1978) 269 Ind. 24, 378 N.E.2d 823; *Hudson v. State*, (1976) 265 Ind. 302, 354 N.E.2d 164.

Stephen fell to the floor simultaneously with the firing of a handgun at close range. He was not moved and was found to be dead when examined shortly thereafter. An autopsy was performed and a bullet, which had entered the front left side of Stephen's abdomen and travelled downward, was removed from a point just above his right hip. From such evidence, a reasonable person could conclude, beyond a reasonable doubt, that Stephen died of a bullet wound.

With regard to Defendant's contention that there was insufficient evidence placing him at the scene of the crime, the evidence revealed the following:

The decedent was shot and killed in his home by one of two men during the commission of a robbery at approximately 5:00 p. m. One of the assailants was identified as Kenneth Brooks by two eyewitnesses who were also victims. Admittedly, the witnesses could not identify the defendant as the other assailant, their testimony concerning the height and the sound of the voice of the unidentified assailant did not match such characteristics of the defendant, and defense witnesses testified that the defendant was elsewhere at the time the crime was committed. Nevertheless, there was also testimony that another armed robbery had occurred at approximately 4:30 p. m. the same day, and, at approximately 7:30 p. m. of the same day, a series of three robberies by force had occurred at an apartment house. The defendant and Kenneth Brooks were identified by eyewitnesses as the ones who perpetrated all four robberies, all of which occurred in Gary, which was the scene of the Skirpan residence. Additionally, also in Gary, at approximately 6:30 p. m. that day, the defendant and Kenneth Brooks were seen together in a bail-bond office.

Part of the money stolen in the robbery of the Skirpans was in bicentennial commemorative coins, which they had been saving. When arrested, later that evening, two silver dollars, two half dollars and two quarters, all of the commemorative issue, were found on Defendant's person. Fur-ther, when the police attempted to arrest the defendant and Brooks, they were travelling together, and the defendant shot at them.

Notwithstanding some discrepancies in the identification testimony, which were matters for the jury to consider, the foregoing related circumstantial evidence was ample to permit a reasonable person to conclude, beyond a reasonable doubt, that the defendant was the assailant with Kenneth Brooks at the time of the robbery and murder.

The defendant's final submission with regard to the sufficiency of the evidence is that there was no evidence that he actually shot Stephen Skirpan. While conflicting inferences as to whether it was Brooks or the defendant who shot Stephen can be drawn from the evidence and although there may have been some conflicts between Mr. Skirpan's description of the assailant and the defendant's actual stature, we find the conflict to be immaterial. Under Ind.Code § 35–41–2–4 (Burns 1979), an offense is committed whenever one intentionally or knowingly aids, induces or causes that offense to be committed. We have held in similar circumstances that concerted action or participation in a crime is sufficient for this purpose. See, e. g., Webb v. State, (1977) 266 Ind. 554, 364 N.E.2d 1016; Simmons v. State, (1974) 262 Ind. 300, 315 N.E.2d 368. The evidence in this case fully supports a determination that the defendant participated in the commission of the crime at bar. (This issue treated further under Issue IV).

### ISSUE II

■ Over the defendant's objections, the trial court permitted the introduction of evidence disclosing his participation in the aforementioned other four robberies. Although not admissible to show a defendant's propensity to commit crimes in general, evidence of prior crimes is admissible, if it is relevant to some issue in the case, most commonly intent, motive, knowledge, plan, identity or credibility. Lawrence v. State, (1972) 259 Ind. 306, 286 N.E.2d 830, and

cases there cited. *Also see* Underhill's Criminal Evidence, § 205 at 595 (6th ed. 1973).

■ In the instant case, the evidence objected to was relevant, in that it had a logical tendency to identify the defendant as the accomplice with Brooks at the time of the Skirpan robbery and murder. He was in the company of Brooks, both before and after the incident and in close proximity thereto, both in time and distance. Additionally, there were a number of similarities in the *modus operandi* by which all the robberies, including the one of the Skirpans, were effected, thus evidencing that they were committed by the same persons.

### ISSUE III

■ The defendant contends that our death penalty statute, Ind.Code § 35–50–2–9 (Burns 1979), under which he has been sentenced to death, is unconstitutional, *per se*, as being in derogation of the proscription against the infliction of "cruel and unusual punishment" of the Eighth Amendment to the Constitution of the United States. Although no claim has been made under the companion provision of Article I, Sec. 16 of our state constitution, it is appropriate that we regard this assignment as a challenge under both the Federal and the State Constitutions.

This Court has consistently held that the death penalty does not offend Article I, Sec. 16. *Adams v. State*, (1971) 259 Ind. 64, 74, 271 N.E.2d 425, 430, (DeBruler, J. and Prentice, J. dissenting) and cases there cited.

With regard to Defendant's claim under the Eighth Amendment, we are governed by the decisions and opinions of the Supreme Court of the United States. Although the Court, in *Furman v. Georgia*, (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, found it unnecessary to determine the constitutionality of death sentences *per se*, the separate opinions of the Justices dealt at length with the issue and arrived at diametrically opposed conclusions. The majority, however, found no *per se* proscription, leaving the unmistakable inference that it was possible, under the amendment, for the states to enact and administer statutes authorizing the imposition of the death penalty.

In response to the Court's holding and opinions in *Furman*, a number of the states, including Indiana, whose death penalty statutes had not passed constitutional muster because they granted to juries the untrammeled discretion to impose or withhold the death penalty in those cases where it was authorized by statute, enacted statutes to replace the deficient ones. Four years later, the Court affirmed three death sentences imposed under such statutes, thus leaving nothing to inference upon the issue. *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas*, (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929.

### ISSUE III(A)

■ Having determined that the death penalty is not unconstitutional *per se*, as being in derogation of either the Eighth Amendment to the Constitution of the United States or Article I, Sec. 16 of the Constitution of Indiana, we now turn to a consideration of the Indiana Statute, Ind. Code § 35–50–2–9 (Burns 1979),[1] in light of

---

1. Ind.Code § 35–50–2–9 (Burns 1979) provides:

(a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one [1] of the aggravating circumstances listed in subsection (b) of this section. In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one [1] of the aggravating circumstances alleged.

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

(2) The defendant committed the murder by the unlawful detonation of an explosive with intent to injure person or damage property.

(3) The defendant committed the murder by lying in wait.

Pronouncements of the Supreme Court of the United States emanating subsequent to *Furman v. Georgia, supra.*

We have very recently considered these matters in *Judy v. State,* handed down January 30, 1981 (Ind.) 416 N.E.2d 95. It was unfortunate that that case was the first to arrive in this Court under the relevant statute, because the condemned man insisted upon waiving his appellate rights, thus depriving us of the benefits that flow from adversary proceedings. It should be noted, however, that although we recognized Judy's right to waive his right to appeal his conviction, we also recognized that we were under legislative mandate to review his sentence, regardless of his wishes in the matter.

"Although we feel Steven Judy can waive and has waived review of any issue that might be raised with reference to his convictions, we believe that the death sentence cannot be imposed on anyone in this State until it has been reviewed by this Court and found to comport with the laws of this State and the principles of our State and Federal Constitutions." *Judy, supra.*

To permit Judy to be put to death upon a finding that his sentence was permissible under our statute, but without regard to

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

(6) The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty.

(7) The defendant has been convicted of another murder.

(8) The defendant has committed another murder, at any time, regardless of whether he has been convicted of that other murder.

(9) The defendant was under a sentence of life imprisonment at the time of the murder.

(c) The mitigating circumstances that may be considered under this section are as follows:

(1) The defendant has no significant history of prior criminal conduct.

(2) The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.

(3) The victim was a participant in, or consented to, the defendant's conduct.

(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.

(5) The defendant acted under the substantial domination of another person.

(6) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

(7) Any other circumstances appropriate for consideration.

(d) If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury, or the court, may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing. The defendant may present any additional evidence relevant to:

(1) The aggravating circumstances alleged; or

(2) Any of the mitigating circumstances listed in subsection (c) of this section.

(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds;

(1) That the state has proved beyond a reasonable doubt that at least one [1] of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation.

(f) If a jury is unable to agree on a sentence recommendation after reasonable deliberations, the court shall discharge the jury and proceed as if the hearing had been to the court alone.

(g) If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one [1] of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

(h) A death sentence is subject to automatic review by the Supreme Court. The review, which shall be heard under rules adopted by the Supreme Court, shall be given priority over all other cases. The death sentence may not be executed until the Supreme Court has completed its review.

the validity of the statute, would have been an aberration beyond comprehension. Accordingly we proceeded to a study not only of the propriety of his sentence under our statute but also of the constitutionality of the statute, in all of its aspects. From that study, diligently pursued, we concluded that our statute and our procedures thereunder and under related statutes and court rules are consistent with and are in full compliance with the pronouncements of the Supreme Court of the United States in *Gregg v. Georgia, supra, Proffitt v. Florida, supra,* and *Jurek v. Texas, supra.*

We have now been subjected to a vigorous challenge and debate in keeping with the tradition of English and American Jurisprudence. We have reconsidered our conclusions in the light of Defendant's arguments and authorities, but no cogent argument or authority has been here presented that was not fully considered, albeit sua sponte, in the *Judy* review, and we are convinced that our decision in that case was correct.

As stated in *Judy, supra,* "We note that our present statute is very similar to the statutes under consideration in those cases, * * * (*Gregg, Jurek* and *Proffitt*) * * * and, in fact, is nearly identical to the Florida statute [2] upheld in *Proffitt.*" Our task

2. The statute upheld in *Proffitt* was Fla.Stat. Ann. § 921.141 (Supp. 1976–1977), which provided:

(1) Separate proceedings on issue of penalty. —Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a special juror or jurors as provided in chapter 913 to determine the issue of the imposition of the penalty. If the trial jury has been waived, or it the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose, unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

(2) Advisory sentence by the jury.—After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);

(b) Whether sufficient mitigating circumstances as enumerated in subsection (6) exist which outweigh the aggravating circumstances found to exist; and

(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

(3) Findings in support of sentences of death. —Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

(a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and

(b) That there are insufficient mitigating circumstances as enumerated in subsection (6) to outweigh the aggravating circumstances.

In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) and upon the records of the trial and the sentencing proceedings. If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with s. 775.082.

(4) Review of judgment and sentence.—The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Supreme Court.

(5) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:

in determining whether our statute meets the current standards is, therefore, minimal.

A comparative analysis of the Florida statute and our own reveals that under both, the determination is made by the judge and require the following, as prerequisites to the imposition and execution of a sentence of death:

(1) A conviction of murder.

(2) A hearing for purposes of determining the sentence to be imposed, separate from the trial at which the issue of guilt was determined.

(3) In jury trials, a finding, by the jury, of at least one (1) of the aggravating circumstances enumerated in the statute.

(4) In jury trials, a finding, by the jury, that mitigating circumstances, if any, are outweighed by the aggravating circumstances.

(5) In jury trials, a recommendation by the jury, as to whether or not the death penalty should be imposed.

(6) A finding by the trial court of at least one (1) of the aggravating circumstances enumerated in the statute.

(7) A finding by the trial court that mitigating circumstances, if any, are outweighed by the aggravating circumstances.

(a) The capital felony was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital felony was committed for pecuniary gain.

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(8) The completion, prior to carrying out the sentence, of an automatic expedited review of the imposed sentence by the Supreme Court of the State.

In holding that the death penalty is not *per se* unconstitutional, the Court said in *Gregg v. Georgia, supra* :

"We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." 428 U.S. at 187, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

Which is but another way of saying that the penalty may be extracted, if the circumstances of the offense and the character of the offender both warrant and if the procedures followed in making the determination are such as reasonably to assure that it was not done arbitrarily or capriciously.

In all three cases, *Gregg, Proffitt* and *Jurek*, the Court examined the pertinent statutes with a view to determining if they met such criteria; and in each case it found that they did, although by varying means. In the Florida case, the Court specifically noted the presence of the eight attributes hereinbefore set forth as being common to both Florida and Indiana, and concluded:

(h) The capital felony was especially heinous, atrocious, or cruel.

(6) Mitigating circumstances.—Mitigating circumstances shall be the following:

(a) The defendant has no significant history of prior criminal activity.

(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

"On their face these procedures, like those used in Georgia, appear to meet the constitutional deficiencies identified in Furman. The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant. He must, inter alia, consider whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant's role in the crime was that of a minor accomplice, and whether the defendant's youth argues in favor of a more lenient sentence than might otherwise be imposed. The trial judge must also determine whether the crime was committed in the course of one of several enumerated felonies, whether it was committed for pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel. To answer these questions, which are not unlike [428 U.S. 252, 96 S.Ct. 2966] those considered by a Georgia sentencing jury, see *Gregg v. Georgia* at 197, 459 L.Ed.2d 859, 96 S.Ct. 2909, the sentencing judge must focus on the individual circumstances of each homicide and each defendant." [428 U.S. 252, 96 S.Ct. 2966], 49 L.Ed.2d 922.

"The Florida capital-sentencing procedures thus seek to [428 U.S. 253, 96 S.Ct. 2967] assure that the death penalty will not be imposed in an arbitrary or capricious manner." [428 U.S. 253, 96 S.Ct. 2967], 49 L.Ed.2d 923.

Looking now to the variances in the Florida and Indiana statutes, we find that in most respects, Indiana is more restrictive in the applicability of death sentences than is Florida. Indiana requires that when the guilt issue was tried by jury, the sentencing hearing must be before the same jury, whereas Florida permits the impaneling of a special jury for the sentencing, under certain circumstances. The finding of enumerated aggravating circumstances must be beyond a reasonable doubt in Indiana, while, in Florida, no standard of proof is specified.

Florida permits the recommendation of a death sentence by a mere majority of the jury; while our statute requires unanimity in the recommendation, if any. Notwithstanding that the court may proceed without a recommendation, if the jury is unable to agree and, notwithstanding that it is not bound by the recommendation, if forthcoming, we are of the opinion that the requirement of the Indiana statute cannot but have a mollifying effect.

The Indiana statute affirmatively provides that there be no limitation upon the mitigating circumstances to be taken into account in determining the sentence, whereas the Florida Act, however, has been interpreted as being without limitation with respect to mitigating circumstances. See *Lockett v. Ohio* (1978) 438 U.S. 586, 606, 98 S.Ct. 2954, 2965–66, 57 L.Ed.2d 973, 991 (citing *Proffitt*, 428 U.S. at 250 n. 8, 96 S.Ct. at 2965–66 n. 8, 49 L.Ed.2d at 922 n. 8).

The Florida statute permits the relaxation of the rules of evidence at the sentencing hearing, but, inasmuch as this could facilitate the presentation of evidence by the State as well as by the defendant, we do not regard the adherence to customary evidentiary rules as having any impact adverse to fundamental fairness.

Neither do we perceive as significant the variance with respect to the time limitation for review placed upon the Supreme Court of Florida but not upon the Supreme Court of Indiana. In both *Gregg, supra,* and *Proffitt, supra,* the Court expressed a very favorable regard for the requirement of a review by the supreme court of the concerned state. However, in neither did it comment upon time limitations or even upon the requirement that such reviews be expedited. The giving of priority to such matters is altogether appropriate. However, no matter can be permitted to domi-

nate the court to the exclusion of all others. The degree of priority given under such a statutory mandate must, therefore, rest in the sound discretion of the court. Any other view would be a denial of our judicial authority and responsibility.

We found in *Judy* that our legislative and procedural scheme comports with the standards and guidelines provided for in *Gregg*, and *Proffitt* at the trial and appellate levels. In *Gregg*, the United States Supreme Court wrote approvingly of the requirement for the sentencing authority to specify the factors relied upon in reaching its decision referring to it as " . . . a further safeguard of meaningful appellate review . . . to insure that death sentences are not imposed capriciously or in a freakish manner." 428 U.S. 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 886–87. This is also required under the Florida statute. As we pointed out in *Judy*, even though this provision is not specifically in our death penalty statute, it is required and followed in the sentencing of all of those convicted of committing felonies in the State of Indiana.

Article 7, § 4 of our Indiana Constitution provides: "The Supreme Court shall have in all appeals of criminal cases the power to review all questions of law and to review and revise the sentence imposed." And under our Indiana Constitution and rules adopted by this Court, exclusive jurisdiction of criminal appeals from judgments or sentences imposing death, life imprisonment or a minimum sentence of greater than ten years, is reposed in this Court. Ind.R. App.P. 4(A)(7).

Our rules for the appellate review of sentences, effective January 1, 1978, are as follows:

"1. *Availability*—Court.

(1) Appellate review of the sentence imposed on any criminal defendant convicted after the effective date of this rule is available as this rule provides.

(2) Appellate review of sentences under this rule may not be initiated by the State.

(3) The Supreme Court will review sentences imposed upon convictions appealable to that Court; the Court of Appeals will review sentences imposed upon convictions appealable to the Court of Appeals.

"2. *Scope of Review.*

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed."

Indiana's general sentencing hearing statutes require in all cases where there are aggravating circumstances present that the sentencing judge include a statement of the reasons for selecting the sentence he imposes. This enactment, Ind.Code § 35–4.1–4–3 (Burns § 35–50–1A–3, (1979 Repl.)) provides as follows:

"Sentencing hearing in felony cases.—Before sentencing a person for a felony the court must conduct a hearing to consider the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and otherwise to present information in his own behalf. The court shall make a record of the hearing, including:

(1) A transcript of the hearing;

(2) A copy of the presentence report; and

(3) If the court finds aggravating circumstances or mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes."

We found in *Judy* that the requirement that the sentencing authority state his reasons in writing in the record facilitated meaningful appellate review by this Court of the trial court's sentencing decision. *Judy, supra; Proffitt v. Florida, supra; Page v. State*, (1980) Ind., 410 N.E.2d 1304; *Brandon v. State*, (1976) 264 Ind. 177, 340 N.E.2d 756; *Love v. State*, (1971) 257 Ind. 57, 272 N.E.2d 456. This statute was de-

signed to restrict trial courts to the rational exercise of their discretion to impose, enhanced or diminished sentences and to facilitate our review of such sentences. Death is an enhanced penalty for murder committed under certain designated circumstances. Ind.Code § 35–50–1A–3 (Burns 1979 Repl.) and all of the other statutory constitutional and judicial requirements set out above are applicable when a death sentence is to be imposed and were complied with in the case before us.

As has been pointed out to us by the defendant, our statutory and procedural scheme is not exactly like those in any of those states whose death penalty procedures have been approved by the United States Supreme Court. However, as that Court stated in *Gregg, supra* : "We do not intend to suggest that only the above described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis." 428 U.S. 195, 96 S.Ct. 2935, 49 L.Ed.2d 887. Thus, although there are some variances in the procedures prescribed under our statute and the Florida statute, those variances do not appear to be critical. The procedures required in *Gregg, supra*, were also different from those required in *Proffitt, supra*, and those required in *Jurek, supra*, were at a substantial variance from those applicable in either of the other two. We hold that our statutory and procedural scheme limits the imposition of death sentences in such manner as to assure that they will not be inflicted in an arbitrary or capricious manner, and upon that basis the provisions thereof for sentences of death violate neither the Eighth Amendment to the Constitution of the United States nor its counterpart in our State Constitution, Article I, Sec. 16.

■ Defendant has cited us to Article I, Sec. 18 of the Constitution of Indiana in support of his position that the death penalty is cruel and unusual punishment violative of the Eighth and Fourteenth Amendments to the Constitution of the United States.

His claim is not supported by cogent argument, and we fail to perceive any interplay between these constitutional provisions. It should be here noted, however, that we have previously held that Article I, Sec. 18 did not proscribe death penalties. *Adams v. State*, (1971) 259 Ind. 64, 271 N.E.2d 425, (DeBruler, J. and Prentice, J. dissenting); *Judy, supra.*

### ISSUE III(B)

■ Defendant also contends that our statute, Ind.Code § 35–50–2–9 (Burns 1979) is constitutionally infirm because: "[I]t does not provide a complete review of the trial court's decision by the Supreme Court." His argument is premised upon the omission from this Statute of specifications to determine the parameters of our review. We have previously noted the similarity of our statute and our procedures to those of Florida approved in *Proffitt v. Florida, supra.* We have also observed that Ind.Code § 35–50–1A–3 (Burns 1979) requires the sentencing judge to make written findings. In *Judy, supra*, and in this opinion, we have pointed out that our Constitution, our statutes, and our court rules provide for a review of all penalties fixed by trial courts, including the death penalty. A review of a death sentence under our rule and pursuant to our Constitution and our aforementioned statutes will meet the guidelines established by the Supreme Court of the United States as expressed in *Gregg v. Georgia, supra; Proffitt v. Florida, supra* ; and *Woodson v. North Carolina*, (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. These cases made it clear that the function of appellate review in the overall consideration of constitutionality is to assure that the system, as applied in a particular case, precludes the capricious and arbitrary infliction of the penalty, by assuring that the legislative guidelines have not been circumvented by the sentencing authority. Our standard of review precluding the revision of sentences authorized by statute except for manifest unreasonableness is, in essence, no different from the recent dictates of the United States Supreme Court that capriciousness and arbitrariness in the infliction of death penalties cannot be other than cruel and unusual.

Mandatory review by this Court, in each case, of the articulated reasons for imposing the death penalty, together with a review of the evidence supporting these reasons assures consistency, fairness and rationality in the operation of the death penalty statute. *Proffitt v. Florida, supra. See Gregg v. Georgia, supra. Cf. Woodson v. North Carolina, supra; French v. State,* (1977) 266 Ind. 276, 362 N.E.2d 834. The application of the guidelines and procedures established by our Constitution, statutes and rules effect an informed, focused, guided and objective inquiry, by all concerned into the appropriateness, under the statute, of capital punishment in a given case. Therefore, as in *Judy, supra,* we hold our death sentencing procedures to be consistent with and in full compliance with those required by the Supreme Court of the United States in *Gregg v. Georgia, supra* and *Proffitt v. Florida, supra,* and thus not violative of the Eighth and Fourteenth Amendments to the United States Constitution.

In reviewing the imposition of the death penalty in this case, it is apparent that all of the statutory procedures were followed in the trial of this defendant. As already set out in this opinion, the jury and the trial judge found the homicide by the defendant here to have been committed in the perpetration of a felony. A separate sentencing hearing was held following the guilt determination, and all mitigating circumstances were considered and weighed against the aggravating circumstance. The trial judge followed the same procedure and in addition, had in his possession and knowledge all the information in the pre-sentence report filed by the probation officer as well as all evidence presented to him by both the parties in aggravation and mitigation at the sentencing hearing. The trial judge made his findings[3] in writing in the record stat-

---

3. The trial court's "reasons for imposition of death penalty" are as follows:

The Court sets out the following reasons for accepting the jury recommendation and imposing the death penalty in this case.

In the first stage of the trial, the defendant James Brewer was found guilty of the intentional killing of one Steven J. Skirpan. At the sentencing hearing, the burden was upon the State of Indiana to prove beyond a reasonable doubt that the intentional murder was committed in the perpetration of a robbery as set forth in the addendum to the charging indictment. The State moved to incorporate by reference, the testimony presented in the first stage of the trial, which motion was granted. The testimony showed that the defendant and his co-defendant announced to the Skirpan family that it was a "holdup"; that they drew guns and demanded money and left the Skirpan home with something in excess of One Hundred, ($100) Dollars. The defendant, while contending that his co-defendant actually shot the victim, testified that the victim was shot in the commission of a robbery. Accordingly, the jury was justified in finding the existence of the aggravating circumstances beyond a reasonable doubt.

In reviewing the seven possible mitigating circumstances considered by the jury, the Court finds:

I

THE DEFENDANT HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL CONDUCT

The defendant took the stand during the sentencing hearing and the State, on cross-examination, established that he had been convicted in the Lake Criminal Court in 1975 of Assault and Battery With Intent to Commit Robbery and also with Entering to Commit the Felony of Theft. The jury was instructed that these matters were admitted for impeachment only and not as aggravating circumstances.

In reviewing the pre-sentencing report which was not available to the jury, the Court found that the defendant was committed to the Indiana State Farm for one (1) year on each of the above counts under the terms of the Minor Sentencing Act and that said terms were served concurrently. The defendant further testified that he was convicted of Auto Theft and the pre-sentencing report indicated that conviction was in Tippecanoe Superior Court and that the defendant was sentenced to 92 days on the Indiana State Farm. The Court further found from the pre-sentencing report that the defendant had a rather lengthy juvenile record including several commitments to Indiana Boys' School.

The report reflects that the defendant was first committed to Indiana Boys' School on the 6th day of March, 1968, for being incorrigible and that he was returned to the institution as a parole violator on the 5th day of February, 1969, for truancy, theft, and possession of a dangerous weapon and was again released after serving 154 days. Defendant was again returned to the institution as a parole violator on the 3rd day of December, 1970, for aggravated assault and battery and again released after serving 176 days. On the 20th day of January, 1972, the defendant was returned to Indiana Boys' School for the fourth time for aggravated

ing therein his reasons for fixing the death penalty, and we have reviewed those find-ings and reasons along with the evidence in the cause. An examination of the entire

assault and possession of a deadly weapon and served 189 days before his final release from the institution.

As hereinbefore indicated, this lengthy juvenile record was soon followed by the auto theft conviction in Tippecanoe County and then the two felony convictions here in Lake County. The felony records alone are sufficient to constitute a significant history of pre-criminal conduct.

## II

### THE DEFENDANT WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE WHEN HE COMMITTED THE MURDER

There was no evidence of any mental or emotional disturbance. The defendant testified that he had been employed full-time at Harrison Metal Company for some 18 months as a burner and, in fact, intended to go to work the morning after the killing. Further, the defendant testified that he and his co-defendant had decided to commit the robberies on the day before.

The Court had the defendant examined after the trial by one Dr. Manuel J. Vargas for the purpose of determining his intelligence quotient. His full scale intelligence quotient when tested with the Wechsler Adult Intelligence Scale (WAIS) was 76. Although this is within the dull normal to borderline range, it cannot be said to constitute extreme mental or emotional disturbance.

## III

### THE VICTIM WAS A PARTICIPANT IN/OR CONSENTED TO THE DEFENDANT'S CONDUCT

The evidence was that the victim was unknown to the defendant. The robbery of the Skirpan home was one of several random robberies committed by the defendant on this day. The defendant and Kenneth Brooks posed as policemen to gain entry to the home and when the victim asked to see a warrant, he was killed.

## IV

### THE DEFENDANT WAS AN ACCOMPLICE IN A MURDER COMMITTED BY ANOTHER PERSON AND THE DEFENDANT'S PARTICIPATION WAS RELATIVELY MINOR

The defendant was charged jointly with one Kenneth Brooks. The father of the victim was able to identify Kenneth Brooks as one of the two people who committed the robbery. He testified that Kenneth Brooks was not the one who shot and killed his son but that it was the other man. The State, by strong circumstantial evidence, was able to show that the other man was defendant, James Brewer. However, the father of the victim also testified that Brooks had a revolver and Brewer an automatic. Expert testimony showed that the bullet removed from the victim could not have been fired from an automatic. Further, when James Brewer testified during the sentencing hearing, he said that Kenneth Brooks fired the shot that killed the victim. The jury was instructed that when two or more people unite in a commission of a crime, each is criminally responsible for the actions of the other in the commission of that crime.

If we were to assume for the purpose of this provision, that the defendant, James Brewer did not fire the fatal shot, the jury would still be justified in rejecting this as a mitigating circumstance. The evidence was that this was only one of several robberies committed by Brooks and Brewer on that date. James Brewer admitted that he entered the Skirpan home with a loaded gun with the intention of committing robbery, that after the victim was shot he proceeded to ransack the home for money and that upon leaving, he and Brooks divided the money equally. Brewer further testified that the pair continued to commit other robberies the same night after the incident and that later when the police were chasing them, he fired at the police car. In the robberies testified to during the trial, there were repeated references of threats to kill made by Brewer. The Court, of course, has no way of knowing whether the jury found beyond a reasonable doubt that defendant James Brewer fired the fatal shot. But even if a jury had some doubt about that, certainly there was no evidence that his participation was "relatively minor."

## V

### THE DEFENDANT ACTED UNDER THE SUBSTANTIAL DOMINATION OF ANOTHER PERSON

There was simply no evidence that the defendant, James Brewer, was under substantial domination of another person.

## VI

### THE DEFENDANT'S CAPACITY TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENT OF THE LAW WAS SUBSTANTIALLY IMPAIRED AS A RESULT OF MENTAL DISEASE OR DEFECT OR OF INTOXICATION

The defendant, JAMES BREWER, did not file a plea of insanity nor did he file a plea alleging lack of comprehension. He did testify that he was high on drugs on the night in question. However, he further testified that he knew what he was doing and could have controlled himself if he had wanted to. He testified that he and Brooks decided the night before to commit the robberies on that date and that he entered the Skirpan home with a loaded gun for the purpose of committing a robbery. As hereinbefore indicated, the defendant's intelligence quotient is within the dull normal to

record discloses that it clearly supports the conclusion that the imposition of the death sentence was determined by the nature of the offense and the character of the defendant. Accordingly, there is no basis for saying that a reasonable person could not find Defendant's sentence to be appropriate to his offense and character. Such sentence, therefore cannot be said to be based upon capricious or arbitrary considerations or manifestly unreasonable.

Since 1972, we have vacated death sentences in eight (8) cases. In *Adams v. State*, (1972) 259 Ind. 164, 165, 284 N.E.2d 757, 758 (opinion on rehearing) it was in response to the holding in *Furman v. Georgia* which left the constitutionality of the statute under which he was convicted and sentenced uncertain. Six of the other cases,[4] came before us following an amended statute and the decisions in *Woodson v. North Carolina, supra, Gregg v. Georgia, supra, Proffitt v. Florida, supra, Jurek v. Texas, supra,* and *Roberts v. Louisiana,* (1976) 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974, *reh. denied,* 429 U.S. 890, 97 S.Ct. 248, 50 L.Ed.2d 173.

In *State v. McCormick,* (1979) Ind., 397 N.E.2d 276, we allowed an interlocutory appeal and held that to permit the State to seek the death penalty, for a count of murder, by virtue of aggravating circumstances consisting of the defendant's alleged murder of another person in an unrelated incident, for which he was under indictment but had not yet been tried, would be a denial of due process. Under such circumstances, he would be prejudiced by being tried on two separate, unrelated charges before the same jury. In each of those cases following *Adams,* the sentence was ordered vacated because the standards and guidelines were absent. They have since been provided, however, as hereinbefore related, and we hold the statute and procedures aforementioned and the sentence of death imposed thereunder upon the defendant to be constitutional under the pronouncements of the Supreme Court of the United States in those cases last mentioned.

### ISSUE III(C)

Defendant next asserts that the constitutional proscriptions against cruel punishment preclude inflicting the death penalty upon one whose role in the crime was that of accessory, as opposed to principal. In support of this contention, he cites *Lockett v. Ohio,* (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, and particularly

---

borderline range. That this alone would not constitute a mental disease or defect.

After the trial, the Court had the defendant examined by Dr. Manuel J. Vargas, Ph. D., a licensed psychologist, who said of the defendant, "He simply acts on feeling and impulse. He appears to live pretty much on the moment without thinking ahead nor looking much behind. Consequently, he tends not to learn from his experiences." A copy of this report is attached hereto.

#### VII
#### ANY OTHER CIRCUMSTANCES APPROPRIATE FOR CONSIDERATION

The only other circumstance that the jury might have possibly considered in mitigation was the fact that the defendant is only 21 years of age and that his mother died when he was 11 or 12 years old. In view of the entire record, this was of minimal importance and certainly could not have been considered significant enough to outweigh the aggravating circumstance. The fact that defendant was of a minority race was of little or no significance in view of the fact that three of the jurors including the foreman were of the same minority race as the defendant. The affects of the limited intelligence of the defendant is well countered by his "street wisdom" and certainly cannot be considered a mitigating circumstance. His manipulation of the police and his alibi witnesses in the fabrication of his alibi during the trial stage reflects a calculating mind that tends to negate the low intelligence quotient score.

IN CONCLUSION, the Court finds the aggravating circumstance ruled upon by the State to have been proven beyond any doubt whatsoever and that there simply was no evidence of any mitigating circumstances to affect it. Accordingly, the Court finds the jury recommendation to be proper and lawful and that the Court has a duty to follow such recommendation.

4. *French v. State,* (1977) 266 Ind. 276, 362 N.E.2d 834; *Bond v. State,* (1980) Ind., 403 N.E.2d 816; *Fair v. State,* (1977) 266 Ind. 380, 264 N.E.2d 1007; *Gaddis v. State,* (1977) 267 Ind. 100, 368 N.E.2d 244; *LaMar v. State,* (1977) 266 Ind. 689, 366 N.E.2d 652; *Murphy v. State,* (1977) 267 Ind. 184, 369 N.E.2d 411; and *Norton v. State,* (1980) Ind., 408 N.E.2d 514.

the separate opinion of Justice Marshall which was especially critical of a system that did not distinguish "between a wilful and malicious murderer and an accomplice to an armed robbery in which a killing unintentionally occurs. * * * and turns on fortuitous events that do not distinguish the intention or moral culpability of the defendants." (Emphasis added).

The *Lockett* judgment, although it reversed the judgment of the lower court to the extent that it had sustained the imposition of the death penalty as to Sandra Lockett, did not hold that the Ohio statute was deficient because it permitted the death penalty for felony murder to be inflicted upon others than those who dealt the death blow. Rather, the statute was overturned because it made provision for consideration, at the sentence determination stage, of but a very limited range of mitigating circumstances. Excluded were age and relative culpability. In essence, the case holds only: "To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." 438 U.S. 586, 608, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973, 992. Our statute has numerous provisions that would militate against the arbitrary imposition of a death sentence upon one convicted under a theory of vicarious liability. We particularly note that felony murder in and of itself is not a capital offense but becomes one only if the murder was committed intentionally and that where a defendant was an accomplice in a murder committed by another; it is expressly provided that the degree of his culpability be considered. Other mitigating factors are: the substantial domination by another, the absence of a significant history of prior criminal conduct and perhaps the most important of all, "any other circumstances appropriate for consideration." Ind.Code § 35–50–2–9(c).

That the Legislature contemplated the imposition of death sentences under circumstances such as those present in this case cannot be questioned in view of the provision that the playing of a "relatively minor" role by an accomplice is a mitigating circumstance.

Accessories are guilty of the same crimes as are their principals. We, therefore, perceive of no reason why it should be *ipso facto* inappropriate to subject them to the same penalties.

Historically, we have imposed death sentences upon aiders and abettors to both intentional murders and felony murders.

In *Neal v. State*, (1938) 214 Ind. 328, 14 N.E.2d 590, 15 N.E.2d 950, we affirmed the convictions of Neal and Marshall for murder in the perpetration of a robbery, for which crime they were sentenced to death. The facts in that case were that the defendants overtook the victim (William Bright) while the latter was in his automobile. The defendants forced Bright from the wheel and drove him out into the country. While there, the defendants removed Bright from the automobile and searched him for valuables. Defendant-Marshall then walked back to the car in order to obtain a rope to secure Bright. En route, Marshall heard the firing of four shots and when he returned, Bright was dead.

In *Hamilton v. State*, (1934) 207 Ind. 97, 190 N.E. 870, and *Witt v. State*, (1933) 205 Ind. 499, 185 N.E. 645, we affirmed the convictions of Hamilton and Witt for murder in the perpetration of a robbery. Again, both defendants were sentenced to death. Here, the facts were that the defendants entered the Standard Grocery Company headquarters in Indianapolis and announced a stick-up. Confusion erupted and shots were fired. As a result, Lafayette Jackson was killed. The cause of his death was determined to be a gun shot wound, inflicted by a bullet from a handgun. Defendant-Hamilton used a pistol during the robbery, while Defendant-Witt used a shotgun.

And in *Rice v. State*, (1855) 7 Ind. 332, and *Driskill v. State*, (1855) 7 Ind. 338, we affirmed the convictions of Rice and Driskill for first degree murder. We also upheld the imposition of a death sentence against each Defendant. The facts here were that the defendants and one other entered the Fahrenbaugh home near Lafay-

ette at night. They attempted to break into a bureau but were prevented from doing so by Cephas Fahrenbaugh. After neutralizing the other occupants of the home, the intruders drug Cephas outside and killed him. He had been shot twice with the same pistol. The Fahrenbaughs could not determine who had in fact shot Cephas.

The defendant's argument that execution of an accessory who had no intention to murder and, in fact, did not personally commit the murder can have no deterrent effect as to such murders is unpersuasive. If the commission of violent crimes can, in fact, be deterred by the rational infliction of the death penalty, reason requires that the program be administered in such manner as will deter all who have a penchant to participate in violent crimes. This, in turn, dictates that those who participate, in a significant way, be eligible for selection to serve as examples.

## ISSUE IV

■ Defendant contends that the evidence adduced at trial was insufficient, in that it did not demonstrate, beyond a reasonable doubt, that he intentionally killed Stephen Skirpan. He makes this contention in the belief that the constitutional provision under review proscribes the imposition of death sentences upon defendants whose roles were accessorial only. We have determined under Issue III(C), that the constitutions do permit the imposition of death penalty, notwithstanding that the conviction is based upon a theory of vicarious liability. Hence it would be unnecessary for us to consider this issue. It should be made clear, however, that Defendant's conviction can stand without resort to the accessorial concept.

This claim of insufficiency is premised upon the inability of either Mr. Skirpan or his niece, who were the sole eyewitnesses to the tragedy, to identify him as one of the assailants, together with Mr. Skirpan's misstatement, as to his height, given to the investigating officers immediately after the event. Additionally Mr. Skirpan testified that Brooks, whom he did identify, was armed with a chrome revolver, and the ballistics tests revealed that the fatal bullet had been fired from a revolver, which is consistent with Defendant's testimony that it was Brooks, not he, who shot Stephen.

Defendant's argument, however, is misplaced in this Court. It is not reconcilable with Mr. Skirpan's testimony that when he went into the room in response to Stephen's call, Brooks was in front of his companion and that it was the man "in back" who fired.

There were but two assailants present. One was Brooks. Strong circumstantial evidence presented at the guilt determination phase of the trial firmly supports a finding that the other was the defendant; and at the sentencing phase, Defendant admitted that he was the other one. It is inescapable that the defendant is the man who stood "in back," announced a hold up and fired the shot that killed Stephen Skirpan, unless Mr. Skirpan's testimony is determined to be unworthy of belief. His credibility was a matter for the jury to determine and cannot be reassessed in this Court under the circumstances of this case. *Bentley v. State*, (1981) Ind., 414 N.E.2d 573.

## ISSUE V

■ Ind.Code § 35–50–2–9(a) (Burns 1979) provides "The state may seek a death sentence for murder by alleging, *on a page separate from the rest of the charging instrument,* the existence of at least one (1) of the aggravating circumstances listed in sub-section (b) of this section." *Id.* (Emphasis added). Defendant contends that the failure of the State to follow this procedure was tantamount to a failure to apprise him that the death penalty would be sought. He erroneously asserts that the statute mandates the charging of the aggravating circumstances as therein directed and misperceives the purpose of the directive.

The procedure urged by the statute is patterned after that provided for charging habitual offenders, Ind.Code § 35–50–2–8, which was adopted in response to our hold-

ing in *Lawrence v. State*, (1972) 259 Ind. 306, 286 N.E.2d 830. In that case, we held that the procedure of reciting the prior offenses in the charging instrument and giving evidence of them in the trial of the current offense was unnecessarily contaminating and patently unfair. The bifurcated proceedings were not fashioned as a means of apprising the defendant of his position, as defendant appears to believe. Rather, they were designed to shield him from the hazard of having the knowledge of his prior criminal record prematurely imparted to the jury. We do not have this potential problem, however, with respect to the presentation of the death penalty issue in *all* circumstances under which the death penalty is applicable, although it is present when the aggravating circumstance to be charged is either a prior murder conviction, a prior murder unrelated to the current offense, or a prior life sentence.

In this case, Defendant was charged, with Brooks, with murder and with intentional murder in the perpetration of a robbery, the latter being the first listed aggravated situation rendering the death penalty applicable under the statute. The killing and the robbery were the same *res*. They could not have been kept separate in the presentation of evidence, and there was no such need. Consequently, there was no benefit to flow to the defendant from segregating the charge of the aggravating circumstances, a robbery, from the charge of the murder.

Defendant's claim that he was not properly apprised that the death penalty would be sought simply belies the record. Arguably, the mere citation of Ind.Code § 35–50–2–9 endorsed at the top of the charging instrument may be regarded as inadequate. However, the record of the arraignment is replete with notices of the penalty sought.

We hold that the procedure utilized in this respect by the State did not prejudice the substantial rights of the defendant and was not error, in this case.

## ISSUE VI

Following the return of the guilty verdict by the jury, the defendant moved for a continuance of the sentencing hearing. The motion was denied because it was not premised upon any grounds and because the jury was sequestered.

The determination of whether to grant a continuance lies within the sound discretion of the trial court, when the motion therefor is not based upon statutory grounds. The denial of such a motion will be overturned only when an abuse of discretion is demonstrated. *Johnson v. State*, (1979) Ind., 390 N.E.2d 1005, *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312; *Works v. State*, (1977) 266 Ind. 250, 362 N.E.2d 144. In this case, the defendant presented no factual basis to the trial court which warranted a delay in the proceedings. He now contends that a continuance was required to permit an investigation of the circumstances of his prior mental problems and that the denial precluded the presentation of mitigating circumstances, in violation of *Lockett v. Ohio, supra,* and deprived him of the right to counsel. We find this contention to be without merit. The denial of a motion grounded upon sheer speculation that some benefit might flow from it cannot be said to be arbitrary or abusive. *Hardin v. State*, (1981) Ind., 414 N.E.2d 570; *Himes v. State*, (1980) Ind., 403 N.E.2d 1377.

## ISSUE VII

Defendant asserts that he was denied his constitutional rights against compulsory self-incrimination at the sentencing hearing, in consequence of his counsel's putting him upon the witness stand in reliance upon the trial judge's informal recommendation and assurance that he would not permit extensive cross-examination. The record, however, does not confirm Defendant's representations.

The sentencing hearing opened with a motion by the State that the evidence introduced at the trial on the issue of guilt be incorporated, by reference, as part of the record of the hearing. The motion was sustained, and the State rested. Thereupon, the defendant, who had not testified

previously, took the stand. On direct examination, he repudiated the alibi testimony and admitted to having voluntarily taken part in the robbery-murder. He added, however, that he had been under the influence of drugs at the time and that it was Brooks, not he, who killed Stephen Skirpan. In consequence of such testimony, the State cross examined Defendant extensively.

We view the decision for the defendant to take the witness stand as a tactical choice and one that we cannot fault, given the circumstances of the moment. The jury had rejected the alibi defense, and the defendant stood convicted of a particularly heinous crime and was subject to the death penalty. That neither the judge nor the jury reacted favorably to the evidence offered in mitigation does not render its tender bad judgment. There was simply no other way to submit mitigating evidence.

The trial judge, by affidavit made pursuant to Ind.R.App.P. 7.2(A)(3)(c), has acknowledged that, in response to defense counsel's request for guidance, he stated that in view of the circumstances, he appeared to have no alternative but to put his client upon the stand. This claim of prejudicial error, in itself, attests to the impropriety of a judge's deviating from his assigned role of impartial referee. However, we appreciate the frustrations of the moment, and we perceive no design by either counsel or the judge to do other than advance the best interests of the defendant. Neither do we believe that the defendant was thereby harmed.

### ISSUE VIII

■ Defendant's assignment that he was denied the effective assistance of counsel at the sentencing hearing is not substantiated by the record. The indicators of incompetence relied upon by Defendant, in the main, appear to have been either tactical decisions or matters over which counsel had no control.

■ With regard to the claims that counsel spent insufficient time preparing for the sentencing hearing, subpoenaed no witnesses and failed to investigate Defend-

ant's history of mental problems, we are not apprised of how Defendant was thereby harmed. The presumption is that counsel was competent, and that presumption can be overcome only by a clear showing that his actions or inactions resulted in a mockery of justice such that our collective conscience is shocked. *Deadwiler v. State,* (1980) Ind., 405 N.E.2d 521; *Robertson v. State,* (1974) 262 Ind. 562, 319 N.E.2d 833. Further, the presumption of competence is reinforced by the record herein.

■ Defendant claims that counsel should have moved *in limine* to exclude evidence of his prior criminal activity from the sentencing hearing and objected to its admission when presented. But, such evidence was relevant at that stage of the proceeding, and there was no basis for its exclusion. Neither was there any basis for counsel to object to the State's motion that the evidence presented at the trial be made a part of the record of the sentencing hearing. The statute expressly provides for the consideration of such evidence at that stage of the proceedings. Ind.Code § 35–50–2–9(d) (Burns 1979).

### ISSUE IX

■ After the jury returned a recommendation of the death penalty, the trial court, *sua sponte* ordered that the defendant be examined by Dr. Vargas, a psychologist. The substance of Dr. Vargas' report was that the tests given to the defendant indicated that he was in the lowest seven (7) percent of the population as to general intelligence, acts on feelings and impulses, without intelligent reflection or analysis and tended not to learn from experiences.

The court considered the report, along with the evidence presented at the trial and the sentencing hearing, in arriving at its decision to impose the death penalty, and the defendant now contends that he did not have access to such report and that it was therefore error for the court to consider it. He cites *Gardner v. Florida,* (1977) 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393, but that case does not support his argument.

In *Gardner, supra,* the court held that it was a denial of due process to sentence one to death, when such sentence was based, in part, upon information which the defendant had had no opportunity to deny or explain. Additionally, in that case, the record did not contain the undisclosed information, thereby frustrating meaningful appellate review.

We first note that although the record does not indicate that a copy of Dr. Vargas' report was ever formally served upon the defendant or his counsel, neither does it reflect or suggest that he was denied access to it. Defendant and his counsel were aware that the examination had been made, and when the sentence was pronounced, the court made reference to the report, and no protest was made. The denial of such access was not assigned in the first motion to correct error but was made a point of contention in the belated motion to correct error. At the hearing thereon, counsel acknowledged that the report was available to him at the time of sentencing, although he did not recall when he had received it; and in announcing its ruling upon the belated motion to correct error, the court stated that the report had been available to defense counsel.

In *Gardner, supra,* the trial court disdained the jury's recommendation and sentenced the defendant to death, but in the case before us, the court followed the recommendation, for which there was ample basis. The reasons given by the trial court for imposing the death sentence reflect that his purpose in ordering the examination was to determine if there were circumstances that militated against the recommendation. There was nothing about the report that was prejudicial to Defendant's interest.

### ISSUE X

Following the sentencing hearing, the jury interrupted its deliberations and inquired of the court as to when the defendant would be eligible for parole, if a life sentence were imposed. A conference was had between counsel and the court and a response agreed to, and given by the court to the jury. In effect, the reply advised

that there was no longer any provision in our statutes for a life sentence, that the range of sentences for murder, if the death penalty was not imposed, was a fixed sentence of from thirty to sixty years and that one sentenced could earn credit for good behavior to apply against the sentence, with a maximum allowable credit of fifty percent of the sentence. The court further instructed that the sentence would be fixed by the court, and that the determination of the jury would not be binding but would be a recommendation only.

This assignment is not available for review under our appellate rules, inasmuch as it was not presented at trial. *Rennert v. State,* (1975) 263 Ind. 274, 329 N.E.2d 595; *Pinkerton v. State,* (1972) 258 Ind. 610, 283 N.E.2d 376. Defendant's position that he is, nevertheless, entitled to review under our fundamental error exception to the aforestated rule is incorrect. We have recently said "fundamental error" transgressing our rules of appellate procedure "must be blatant, and the potential for harm must be substantial and appear clearly and prospectively." *Nelson v. State,* (1980) Ind., 409 N.E.2d 637, 639.

We are, nevertheless, at liberty to review questions, notwithstanding non-compliance with our rules, *Lindsey v. State,* (1976) 264 Ind. 198, 341 N.E.2d 505; and we deem this an appropriate case for such action, in view of the gravity of the matter and the need for guidance concerning a newly established procedure.

Although we have condemned arguments and instructions that invite or tempt the jury to consider the ultimate sentence likely to be served, *Feggins v. State,* (1977) 265 Ind. 674, 359 N.E.2d 517; *Inman v. State,* (1979) Ind., 393 N.E.2d 767, our concern has been with cases where there was no need for the jury to have such information, because, under the law, they were not concerned with sentencing. Imparting such knowledge, therefore, could not be beneficial, and the potential for polluting the guilt determination was present. We are not confronted with that problem,

however, in the case before us. Not only had the guilt determination been made and thus could not be influenced, but also there was a definite need for the jury to have such information.

Notwithstanding that the sentence determination by the jury is not binding upon the judge, we do not regard it as a mere formality having no substantive value. If we did, error if any, in such regard could not be other than harmless. On the contrary, the recommendation of the jury is a very valuable contribution to the process, in that it comes from a group representative of the defendant's peers, who are likely to reflect, collectively, the standards of the community. The ultimate determination cannot be made in a vacuum. Hence recommendations, if they are to have relevance, must be arrived at in the light of available alternatives. Given the task of the jury at this stage of the hearing, it is altogether proper that they be fully aware of the consequences of a prison sentence as well as of the consequences of a death sentence.

## ISSUE XI

Defendant asserts that his punishment is cruel and unusual, inasmuch as it is excessive and irrational when compared with the sentence of sixty years imprisonment awarded Brooks, his accomplice, who, according to Defendant's testimony, was the "triggerman."

We have hereinbefore held that there was evidence to support a finding, beyond a reasonable doubt, that the defendant was the "triggerman," in which event his argument upon this point is moot.

Assuming that the evidence leaves a reasonable doubt upon this issue, there is, without question, substantial probative evidence that it was he who fired the fatal shot. The only evidence that it was fired by Brooks was the defendant's testimony given at the sentencing hearing. This testimony is subject to considerable scrutiny, considering not only the defendant's position to benefit from it but also that at the trial upon the issue of guilt, he had presented an alibi defense.

The defendant was sentenced on March 1st and Brooks more than nine months later, by a judge other than the one who sentenced Defendant and apparently upon a guilty plea. We are not privy to evidence that induced the sixty year sentence for Brooks, hence we have no basis for concluding that the sentences were not properly proportioned. Conceivably, there may have been mitigating circumstances shown that would have rendered the death sentence for Brooks unreasonable, even assuming that he was the one who fired the shot.

## CONCLUSION

We find no reversible error with respect to either the guilt determination or the sentence determination.

The findings and reasons of the trial court are a part of the record.[5] We have reviewed the evidence in detail. It would serve no purpose to burden this opinion with a further recitation. That which has hereinbefore been detailed discloses that there is a rational basis under the provisions of Ind.Code § 35–50–2–9 (Burns 1979) for the sentence imposed. Said sentence, therefore, is not manifestly unreasonable in light of the nature of the offense and the character of the offender.

The judgment of the trial court is affirmed in all things; and this cause is remanded to the trial court for the purpose of fixing a date for the sentence to be executed.

GIVAN, C.J., and HUNTER and PIVARNIK, JJ., concur; DeBRULER, J., dissents with opinion.

DeBRULER, Justice, dissenting and concurring.

Appellant was convicted pursuant to the provisions of Ind.Code § 35–41–2–4(1) for the murder of Stephen Skirpan. He thereupon became subject to another trial upon

---

**5.** *See* note 3 *supra.*

allegations of aggravating circumstances for the purpose of determining whether he should be given the death sentence. A burden was upon the prosecution to prove the alleged aggravating circumstances to the jury, and ultimately to the judge, beyond a reasonable doubt.

## I.

The indictment and the jury instructions informed the jury that appellant was charged with "knowingly or intentionally" killing Stephen Skirpan by "knowingly or intentionally shooting" him. The jury received an instruction based upon Ind.Code § 35–41–2–2, defining both intentional and knowing conduct. The jury returned a verdict which stated simply: We, the jury, find the defendant, James Brewer, guilty of murder. As this general verdict is consistent with a conclusion of the jury that appellant had the *knowing* mental state and with a conclusion that appellant had the *intentional* mental state, it does not provide a basis for choosing which of the states of mind the jury actually determined. Only the culpability of an intentional killing can justify the death penalty pursuant to the aggravating circumstances alleged in this case, a knowing one cannot.

In instructing the jury at the sentencing hearing, the judge informed the jury that:

"In the first stage of this trial, you found that Defendant, JAMES BREWER, guilty of the charge of Murder *as alleged in the State's charging indictment.*" (Emphasis added.)

And he informed the jury:

"In the second or sentencing stage of this trial the State is seeking the death penalty by alleging that the Defendant, James Brewer . . . did . . . *knowingly or intentionally kill* and murder . . . Stephen Skirpan . . . by . . . knowingly or intentionally shooting . . . him.*" (Emphasis added.)

And he instructed the jury that the death penalty statute defined one of the aggravating circumstances as follows:

"1.) The defendant committed the murder by *intentionally killing* the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery." (Emphasis added.)

The jury returned the following recommendation:

"The Defendant, JAMES BREWER, having been found guilty of murder, we, the Jury, recommend to the Court that the death penalty be imposed."

The judge at sentencing relied upon that verdict in stating his reasons for imposing the death penalty. He stated:

"*In the first stage of the trial, the defendant, James Brewer, was found guilty of the intentional killing of one Stephen J. Skirpan.* At the sentencing hearing, the burden was upon the State of Indiana to prove beyond a reasonable doubt that the intentional murder was committed in the perpetration of a robbery as set forth in the addendum to the charging indictment. The State moved to incorporate by reference, the testimony presented in the first stage of the trial which motion was granted. The testimony showed that the defendant and his co-defendant announced to the Skirpan family that it was a 'holdup'; that they drew guns and demanded money and left the Skirpan home with something in excess of One Hundred ($100) Dollars. The defendant, while contending that his co-defendant actually shot the victim, testified that the victim was shot in the commission of a robbery. *Accordingly, the jury was justified in finding the existence of the aggravating circumstances beyond a reasonable doubt.*" (Emphasis added.)

The sentencing judge concluded his statement with the following:

"In conclusion, the Court finds the aggravating circumstance, ruled [sic] upon by the State to have been proved beyond any doubt whatsoever and that there simply was not evidence of any mitigating circumstances to affect it. Accordingly, the court finds the jury recommendation to be proper and lawful and that *the Court has a duty to follow such recommendation.*" (Emphasis added.)

It is apparent from this record of proceedings that there has been to date no determination by the judge or jury that appellant "committed the murder by intentionally killing the victim" as required by subsections (b)(1), (e)(1) and (e)(2), of the death penalty statute. The judge made no determination himself and relied upon the general verdict of guilty to satisfy this requirement. That verdict does not contain a determination that the jury found appellant to have "intentionally" killed the victim. The judge's conclusion that the State proved the aggravating circumstance beyond a reasonable doubt cannot stand.

II.

This Court is called upon to construe and apply the aggravating circumstance alleged against appellant made pursuant to Ind. Code § 35–50–2–9(b)(1), which provides:

"The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape or robbery."

The aggravating circumstance identified here is the coexistence of two separate and distinct culpabilities with conduct constituting two separate crimes, in and by the same person, i. e., the commission of two offenses specified. The elements of this aggravating circumstance are the following:

(1) The death of the victim as the result of inflicted injuries.

(2) The defendant had the conscious objective to inflict injury upon the victim and cause his death. Ind.Code § 35–41–2–2 (definition of intentional)

(3) The defendant had the culpability required for the underlying felony, i. e., in this case he had the conscious objective to take property from the victim. Ind.Code § 35–42–5–1 (robbery statute)

(4) Conduct satisfying the remaining elements of intentional murder and the underlying felony.

In arriving at his final conclusion that the aggravating circumstance was proven, the sentencing judge found that the jury had found appellant guilty of the intentional killing. At trial on the charge, however, the jury was instructed as follows:

"It is a fundamental principal of law that where two or more persons engage in the commission of an unlawful act, each person is criminally responsible for the actions of each other committed in the execution of the common design or plan even though not intended as part of the original design or plan. It is not essential that participation of any one person to each element of the crime be established."

Under this legal principal, the verdict of guilty may have been arrived at without a determination that appellant personally held the conscious objective in mind to kill the victim. I agree with the opinion of White, J. in *Lockett v. Ohio*, (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, that

"death may not be inflicted for killings consistent with the Eighth Amendment without a finding that the defendant engaged in conduct with the conscious purpose of producing death . . . ." 98 S.Ct. at 2981.

I would add to this as well that the conduct of the defendant must be immediately connected to the deliberate taking of the life of the victim. Cf. separate opinion of Blackmun, J., in *Lockett v. Ohio, supra*. I find the Indiana statute and the position taken by Justice White to be in accord. Our statute states: "The defendant committed the murder by intentionally killing the victim . . . ." The phraseology "by intentionally killing" serves to stress this culpability and to exclude a "knowing killing". The statute here is focusing upon the actual state of mind of the defendant at its primary and personal level and not at a vicarious level. I do not discount the support for the conclusion reached by the majority that evidence simply establishing guilt of the two offenses is necessarily and inevitably sufficient to establish the aggravating circumstance proscribed under subsection (b)(1) above. Both views of this statute are

supportable. However, in light of the irrevocable nature of the penalty involved, the Legislature should make its purpose clear, if it be that persons having no actual conscious purpose of producing death are to be executed.

I vote to affirm the conviction, but to set aside the penalty of death.