Eric D. HOLMES, Appellant,

v.

STATE of Indiana, Appellee.

No. 49S00–9002–DP–00104.

Supreme Court of Indiana.

Aug. 7, 1996.

Rehearing Denied Jan. 17, 1997.

Richard Kammen, James T. Flanigan, Susan D. Rayl, McClure, McClure & Kammen, Indianapolis, Arnold P. Baratz, Allen, Baratz & Conway, Indianapolis, for Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

DeBRULER, Justice.

Appellant Eric D. Holmes was convicted in a jury trial of two counts of murder for the intentional killing of Charles Ervin and the intentional killing of Theresa Blosl. Ind. Code Ann. 35–42–1–1(1) (West Supp.1995). The jury could not decide upon a sentence recommendation on a separate count calling for the sentence of death. Thereafter the trial judge did impose the sentence of death on the basis of the B(1) aggravator, killing while robbing, and the B(8) aggravator, multiple murder. Ind.Code Ann. 35–50–2–9(b)(1) and (8) (West Supp.1995). Appellant was also convicted on three additional counts: attempted murder of Amy Foshee, robbery, and conspiracy to rob, and was sentenced accordingly. Multiple claims are made in this direct appeal of the convictions and sentences.

Appellant's partner in this attack, Michael Vance, was separately tried by jury and convicted of two counts of felony murder, a count of robbery, and a count of attempted murder for his role. *Vance v. State,* 620 N.E.2d 687 (Ind.1993). He received a total executed sentence of one hundred ninety (190) years.

The evidence tending to support the verdicts against appellant showed that he got into an argument with his fellow worker Amy Foshee and was fired from his job at a Shoney's restaurant where he had worked for at least three months. At the time of closing that day, Charles Ervin, a manager, Theresa Blosl, a manager, and Amy Foshee, a worker, were leaving the restaurant. Ervin was carrying the till. Appellant Holmes, then 21 years of age, and Michael Vance trapped the three in the foyer—appellant preventing them from going outside and Michael Vance preventing them from going back inside. Holmes and Vance attacked the three and grabbed the till. The three were

grabbed and stabbed multiple times. Appellant said, "Murder in the first degree," "This is the real truth?" and "We will triumph." Ervin and Blosl died, but Foshee survived.

Gail Watkins, a friend of Raymond Vance and also a worker at Shoney's, left work with Raymond Vance and appellant, who said of Amy Foshee, "I'm going to kill that bitch tonight." He also said he was going to spit on her glasses.

Foshee testified at trial, described the attack in detail, and identified appellant and Michael Vance. While appellant had been fired from his job at the restaurant hours before the attack, Michael Vance had started working there that day upon being rehired. Foshee could not recall whether it had been appellant or Vance who had stabbed her.

Raymond Vance, brother of Michael Vance and also an employee of the restaurant, also testified at trial. He said that Michael Vance had driven another brother's car to the restaurant and parked it in the lot on the same night. Raymond was dozing in the car. He saw appellant and Michael Vance talking in front of the restaurant with Ervin and Blosl. Then appellant and Michael Vance entered the car. Appellant said "Mike, I did it. I was wrong but I did it". Both then said, "We're ruthless." Both were covered with blood from the waist down. Raymond went with them to change cars, procure a motel room, shower, change clothes, and discard some things. Appellant was bleeding from cut wounds on his hand. Raymond testified pursuant to a plea agreement for a five year sentence for assisting appellant and Michael Vance.

Laura Scott testified that she lived with Andy Vance in an apartment and that Michael and Raymond Vance sometimes stayed there. She further testified that appellant and Michael Vance came to the apartment at one or two a.m. on November 16, 1989 and began to play loud music. She saw blood on the rug and wall of her bathroom. Appellant said, "I killed the mother fuckers." The police soon knocked on the door, and Michael Vance and appellant ran to the back of the apartment, but were soon arrested.

## 1. Prosecutorial misconduct

■ Judge Emkes granted a motion in limine, ruling that victim impact evidence and related legal arguments would not be permitted absent a special showing of relevance. The prosecution sought to admit a photo of the victim Blosl depicting her during life with her small child and a photo of the victim Ervin depicting him during life. The court ruled them inadmissible. Jurors may have observed these photos in the possession of the prosecutor as he started the rebuttal portion of his final jury summation at the penalty phase. There is, however, no direct evidence in the record of the extent of any such observation.

During the opening phase of the jury summation at the penalty stage, the trial prosecutor disputed the value of much of the testimony given by a wide array of mitigation witnesses. The prosecutor criticized some letters indicating remorse written by appellant while awaiting trial. He was also critical of testimony describing appellant's religious activities while awaiting trial. Basically, he argued that these were manufactured to gain sympathy at the forthcoming trial. No issues are raised with respect to that opening phase.

The defense lawyer responded to these depreciatory yet appropriate statements of the trial prosecutor by pointing out the many historical documents supporting the mitigating evidence and calling the prosecutor's efforts insulting to the jury. Defense counsel closed by stating that he was not ashamed to cry for the victims and for appellant.

The trial prosecutor opened his rebuttal with four heated statements intersticed with defense objections and rulings of the court striking the statements:

He's not ashamed to cry, because he cries at every case.

And I'm going gonna fight for the victims like he says he's gonna fight for the Defendant. And nobody can stop me. (pointing) He can't, and she [meaning the trial judge] can't. Nobody can stop me.

The law doesn't permit me to give you information about the victims or photographs of the victims and how they were

when they lived. It doesn't. That's why you haven't heard anything. We have no humans in this case. The people's case has no humans. You're not permitted to hear about them, about the victims.

Let him pull on your heartstrings and gain your sympathy in an underhanded way if he wants to. Lawyers have cues to do just that. To cry at the appropriate time. To touch the Defendant in front of the jury. They are masters at this kind of thing.

The jury was removed. A defense motion for mistrial was denied. A defense motion to dismiss the death count was denied. When the jury was returned, the trial court admonished the jury to disregard the statements. The prosecutor then restarted his rebuttal argument by profusely apologizing before the jury for his unprofessional behavior. The argument concluded without further ado.

■ A claim of prosecutorial misconduct is to be approached upon consideration of whether in fact the prosecutor engaged in misconduct, and if so, whether the misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Bellmore v. State*, 602 N.E.2d 111 (Ind.1992), *reh'g denied; Maldonado v. State*, 265 Ind. 492, 355 N.E.2d 843 (1976). Here there was misconduct in three respects: (1) disrespect shown the court and its rulings favoring the defense, (2) personal attack upon the integrity of opposing counsel, and (3) attempts to persuade the jury with evidence which had been ruled inadmissible by the trial court, and the mention of which had been expressly forbidden by court order. Here however, the misconduct did not place appellant and his right to fairness in the jury recommendation process in grave peril.

The trial court repeatedly admonished the jury that the argument of counsel was not evidence and that the jury should rely on its memory of the evidence admitted. The trial court's special admonition in response to the above quoted outburst of the prosecutor was almost immediate, was complete in content, and was reinforced by the prosecutor's apology. An admonition alone is usually sufficient to maintain a fair balance between the two sides. *Hill v. State*, 497 N.E.2d 1061 (Ind. 1986). As a whole the jury summation was quite regular, uninterrupted before and after the trial prosecutor's outburst. *See Robinson v. State*, 260 Ind. 517, 297 N.E.2d 409 (1973). The outburst followed closely upon the conclusion of an effective presentation of a very complete body of mitigating evidence describing deficiencies in the support and guidance given appellant as he was growing up. Among the ongoing trial events, the trial prosecutor's outburst calling for sympathy because of the restraint upon victim impact evidence would not have been particularly impressive. In addition to the abatement of its influence from the judge's condemnatory ruling and the apology by the prosecutor, its impact on jurors would have been curtailed in effect by (1) the limited nature of any view of the photographs by the jurors, and (2) the absence of any mention of a deleterious impact upon persons other than the deceased victims themselves. The probable persuasive effect of the misconduct upon the jury deliberations upon its penalty recommendation, in favor of life or in favor of death, under all the circumstances, was minimal. The misconduct did not result in grave peril and the motion for mistrial and the motion to dismiss were properly overruled.

■ Appellant argues that a more stringent standard than the one announced in *Maldonado* should be employed when evaluating a prosecutorial misconduct claim in a capital case, particularly one in which the intentionality of the misconduct is in the high range as it was in this instance. It is urged that when prosecutorial misconduct at the jury sentencing phase occurs and the jury is unable to arrive at a recommendation as occurred in this case, a standard such as that used when reviewing a judge's decision to impose death where the jury recommended against death should be adopted by this court. *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989), *reh'g denied*, 539 N.E.2d 4 (Ind.1989); *Roark v. State*, 644 N.E.2d 565 (Ind.1994), *reh'g denied.* This argument does not adequately support such a fundamental change. A heightened concern for fairness in capital cases can be adequately sustained by the process of factoring intentionality and jury indecision into the overall

circumstances to be considered in determining whether grave peril is or was present.

## 2. Use of perjured or undisclosed evidence

■ Lt. Joie Davis testified that when arrested and being walked to a police car, appellant chanted "first degree murder". This was incriminating evidence, as it tended to support the questionable recollection of surviving victim Foshee that it had been appellant who had made a like statement at the scene of the attack. Davis had previously testified in his deposition that appellant had made no statement other than that he didn't like the music played in the squad car. A defense motion for mistrial on the basis of this testimony was denied. The court did grant an overnight recess to permit preparation for cross-examination, and the defense did then conduct a thorough cross-examination of the officer about his prior statements.

■ Appellant here claims the use of perjured testimony. This claim was not made at trial. Despite this we turn to the merits of the issue. A conviction resulting from the knowing use of perjured testimony would be fundamentally unfair and should be reversed. *Sypniewski v. State*, 272 Ind. 657, 400 N.E.2d 1122 (1980). The claim is not sustained in this case because of insufficient support for the claim of falsity. Davis testified that he had not mentioned these statements in his police reports because they did not seem sufficiently significant, but he had mentioned them to prosecutors in 1990 or 1991. He did not mention the statements to the present trial prosecutor until fifteen minutes before going on the stand. It is plausible that a person who has just been arrested might repeat the name of the crime for which he has just been arrested and that repetition might seem to have little incriminating significance to an arresting officer, listening intently for admissions against interest. There was here no more than an inconsistent quality to the testimony of Lt. Davis warranting the fullest opportunity for cross-examination.

■■ Appellant also claims that the prosecution violated its disclosure duties by failing to produce this testimony of Lt. Davis for consideration of the defense before trial and before the defense committed to a trial strategy. The ruling of a trial court fashioning a remedy for a discovery violation is reviewable only for an abuse of discretion. *Phillips v. State*, 550 N.E.2d 1290 (Ind.1990), *reh'g denied.* The usual remedy is a continuance. Mistrial is an extreme remedy. Two of the State's main witnesses testified that appellant made the same or similar statements shortly after the crime. The trial court ruling is properly sustained in light of the evidence as a whole.

## 3. Victim impact evidence

■■ Appellant claims that improper victim impact evidence was received by the jury and the sentencing court in the process by which he was sentenced to death. Generally, victim impact evidence is evidence which demonstrates the consequences suffered by a victim or a victim's family as a result of a crime. Ind.Code Ann. 35–38–1–8.5 (West Supp.1995). Such evidence is inadmissible unless it is relevant to the death penalty statute's aggravating and mitigating circumstances. *Bivins v. State*, 642 N.E.2d 928 (Ind.1994), *reh'g denied; Burris v. State*, 642 N.E.2d 961 (Ind.1994), *reh'g denied.* Error in the receipt of victim impact evidence may be harmless beyond a reasonable doubt, and thus may warrant no remedy on appeal. *Bivins*, 642 N.E.2d at 957. For the reasons expressed in the section above dealing with prosecutorial misconduct, including the brevity of any view of the photos of the two victims which may have disclosed victim impact of the crime, we find any error at the jury sentencing hearing regarding the receipt of victim impact evidence to have been harmless beyond a reasonable doubt.

■ In the present case, the victim of the attempted murder, Amy Foshee, testified among other things at the sentencing hearing before the judge that she had suffered a miscarriage during the first week of the trial. She also stated that she had become prejudiced against black men as a result of the crime. David Crowley testified among other things at the same hearing and called for the court to consider the future of the families of Blosl and Ervin, particularly the one child of

Blosl and the two children of Ervin. Neither Foshee or Crowley made an express sentence recommendation to the court.

Prior to the sentencing hearings, the trial court issued an order in limine to limit victim impact evidence to that which was relevant to mitigators and aggravators. At the sentencing hearing, there was no objection to the testimony of Foshee and Crowley, however, defense counsel reminded the judge that testimony in contravention of the order in limine had been received. The trial judge ruled that the irrelevant portions were discernible by her and that she would not give consideration to those portions in arriving at her decision. In light of the brevity of the testimony of Foshee and Crowley and the lack of acrimony evident in it, the assurance given by the trial court that irrelevant parts would be ignored by her, and the absence in record of any indication that weight was accorded these irrelevant parts when arriving at the sentence of death, we conclude that any error in receiving this victim impact evidence was harmless beyond a reasonable doubt.

■ Appellant argues that the error in receiving the victim impact evidence in this case can not be harmless, by reason of Article I, Section 18 of the Constitution of Indiana wherein in it prohibits "vindictive justice." There is no apparent tension between the application of the most stringent harmless error standard and the prohibition against vindictive justice. Appellant also argues that a ruling denying discovery of victim impact evidence denied him due process. Here, the evidence was of the type readily to be anticipated and fully appreciated. For example, the testimony of Foshee at sentencing hearing before the judge was brief. She testified at the guilt/innocence phase and thus had been available for discovery with respect to the adverse consequences to her from the attack. The cross-examination of Crowley was very effective. No motions for continuance to permit development of rebuttal were made. The defense was not unfairly hampered. *Chandler v. State,* 275 Ind. 624, 419 N.E.2d 142 (1981).

## 4. Instruction that the jury "should" convict or acquit

■ Appellant finds insufficient binding force in the instruction given the jury that it "should find the defendant not guilty" of a particular charge if the State failed to prove each element beyond a reasonable doubt. It is argued that the binding force of the term "should" is inadequate and is further diminished when considered with the instruction pursuant to Article I, Section 19 of the Indiana Constitution, that the jury is the judge of the law, and when considered with the fact that in this case, the prosecutor in voir dire, stated repeatedly that the law is that the jury "must" convict upon proof of guilt beyond a reasonable doubt. There was no objection to the instruction or to the statements of the prosecutor. The issue was thus not raised and preserved for appeal. *Snider v. State,* 274 Ind. 401, 412 N.E.2d 230 (1980), *reh'g denied.* Furthermore, this instruction was approved in *Mitchem v. State,* 503 N.E.2d 889 (Ind.1987). Finally, we agree that the term "should" lacks that absolute quality present in other terms, such as "must." *See Loftis v. State,* 256 Ind. 417, 269 N.E.2d 746 (1971). Nevertheless, it does adequately instruct the jury on what the law contemplates as the proper course for the jury in the event there is a failure of proof by the prosecution. Thus, the jury was properly instructed.

## 5. Non-statutory aggravators

Appellant claims that in sentencing, the trial judge erroneously gave weight in favor imposition of the death sentence to non-statutory aggravators. In *Bellmore v. State,* 602 N.E.2d 111 (Ind.1992), *reh'g denied,* this Court held that the aggravators to be weighed against mitigators in the death sentence process are only those expressly enumerated in the death sentence statute. Ind. Code Ann. 35–50–2–9(b) (West Supp.1995). In *Bellmore,* after first properly restricting aggravators to those enumerated and deemed proved, the trial court erroneously added additional weight on the aggravator side of the scales for a present lack of remorse evidenced by the defendant's acquisi-

tion of a tattoo after conviction and before sentence.

Here, by contrast, the trial judge's references in the sentencing order to premeditation, deliberation, moving intently from one killing to the next, and the use of extreme force and torture, makes in perfectly clear that she was considering the manner in which the aggravators occurred for the sole purpose of giving an appropriate weight to those proved aggravators. In referring to the opportunity which the defendant had to rise above his background, the trial judge makes it perfectly clear that she is in the process of determining the existence and weight of mitigators. The procedure employed here is entirely consistent with governing case law.

### 6. Adaptation to jail life mitigator

In her written sentencing order, the trial court placed the evidence of mitigating circumstances in eight categories and gave some mitigating weight to six of them. The testimony which described that appellant adjusted well to the jail environment was placed in one of the six, which received only minimal weight. Here, the factor was not overlooked and was considered as required by pertinent case law. *See Bivins v. State*, 642 N.E.2d 928 (Ind.1994), *reh'g denied.* This mitigator envisions appellant serving time without being a danger to guards and other prisoners and making some personal improvement gains. As such, there are no relevant factors warranting greater consideration than those provided by the trial court.

### 7. Age as a mitigator

Appellant was twenty-one years old when this crime occurred. The trial court mentioned age within a general background category, considering it within the context of appellant having lived in foster homes from age eleven to age eighteen. Appellant did graduate from high school, although without passing grades. He lived on his own from age eighteen to age twenty one. The category as a whole received moderate weight.

Twenty-one is the age at which this society recognizes full independent personhood. It is the age of full responsibility. Ordinarily one is considered mature enough to drive at sixteen, mature enough to vote at eighteen, mature enough to marry without parental consent at age eighteen, and mature enough to purchase and consume alcohol at twenty-one. Differing views regarding this age are not posited here and there is no cause warranting additional discrete mitigating weight.

### 8. Mental Retardation

After appellant's trial, conviction, and sentence, the Indiana legislature amended the death penalty statute to preclude imposition of the death penalty for mentally retarded offenders. Ind.Code Ann. 35–50–2–9(a) (West Supp.1995). A mentally retarded individual is one who before becoming twenty-two (22) years of age manifests: (1) significant subaverage intellectual functioning and (2) substantial impairment of adaptive behavior. Ind.Code Ann. 35–36–9–2 (West Supp. 1995). According to the Diagnostic and Statistical Manual of Mental Disorders (DSM–III–R), IQ levels of the mentally retarded fall in the range of 20 to 70. By a specific saving clause, this amendment is not directly applicable to appellant's sentence. Ind.Code Ann. § 35–36–9–1, n. (West Supp.1995). The amendment could not mandate a result on this issue.

Prior to the amendment precluding the execution of the mentally retarded, mental retardation could be considered as a mitigating factor. Indeed, Judge Emkes noted in the sentencing order appellant's IQ scores at the 79 level and falling within the low to average intelligence level. The court placed this note within the general background category of considerations and granted the category as a whole moderate mitigating weight. Viewed in light of the totality of appellant's background, his intellectual functioning as a mitigating factor was fully considered and appropriately assessed.

### 9, 10, and 11. Non-death Sentence of Co-defendant

Appellant contended that mitigating weight should be accorded the fact that Michael Vance did not receive the death penalty for his participation in these crimes. The trial court agreed. It granted only minimal weight, however, finding that appellant was "more of a participant in the crimes." The

trial court based this finding upon evidence that appellant Holmes was angry at the victims, had a motive of revenge, had to use his employment relationship to further carry out the crimes and knew he would be recognized if anyone survived the attack.

These conclusions of the trial court are supported by the details of evidence. At 10:00 p.m., appellant left work with Raymond Vance and espoused an intent to do harm. He returned with Michael Vance at approximately midnight, with a plan to do harm worked out. Appellant's major role in the planning and his culpability at the utmost limit are reasonable to infer. Michael Vance had been rehired to begin work the day of his arrest. Appellant was much better known. Appellant's risk of identification if the victims were not killed was greater. Furthermore, the trial court might well have added support for the finding by noting appellant's incriminating admissions made after the crimes, as well as the wounds he suffered to his hand in the attack, which showed clearly that he had used his hands in subduing the three victims.

As appellant points out, it is true that there was evidence that Michael Vance was more vocal at the time of the crimes, urging that the killings be completed, that he provided their transportation to the restaurant to commit the crimes and to escape afterward, and that he too was also covered with blood. Upon review, however, we are in accord with the trial court's view of this potentially mitigating element. The sentencing court properly considered this factor. *Bivins, supra.*

Furthermore, we conclude the evidence was sufficient to establish that appellant was the more culpable of the two. The sentences were thus not disproportionate. *Roche v. State,* 596 N.E.2d 896 (Ind.1992).

## 12. Disregard of Jury's Non-recommendation

■ Appellant claims that the trial court was in error for not considering the jury's alleged ten-to-two vote against the death penalty as a mitigating factor when determining whether or not to impose the death sentence. First, there is no finding that the jury was split ten to two, the record of the trial reflecting only that the jury was unable to reach a recommendation. Second, this court has twice held over vigorous dissent, including that of the author of this opinion, that a jury's inability to reach a recommendation need not be considered as a mitigating circumstance and has no effect upon subsequent court sentencing procedure. *Roche v. State,* 596 N.E.2d 896 (Ind.1992); *Burris v. State,* 642 N.E.2d 961 (Ind.1994), *reh'g denied.*

## 13. Legal Standard

■ When a jury makes a recommendation against imposing the death penalty, the sentencing judge can only impose the death penalty if at the point of final decision, the judge evidences in the court's written sentencing statement that due consideration to that recommendation was given. *Roark v. State,* 644 N.E.2d 565 (Ind.1994), *reh'g denied.* This form of jury participation in the criminal sentencing process, as distinguished from jury participation in determining guilt or innocence, is not required by the state or federal constitutional rights to trial by jury and due process. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Collins v. State,* 275 Ind. 86, 415 N.E.2d 46 (1981), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); *Mack v. State,* 203 Ind. 355, 180 N.E. 279 (1932); *Miller v. State,* 149 Ind. 607, 49 N.E. 894 (1898). Jury participation in the death sentencing process as a recommender is a humane and highly laudable statutory role. According to the statute defining this role, a recommendation for or against the death penalty must be unanimous. In the event the jury is divided on the issue and can reach no unanimous recommendation, the jury's participation is at an end and sentencing by the court proceeds to a conclusion without the benefit of a recommendation.

■ Appellant argues that the sentencing judge should give consideration to an opinion against imposing the death penalty when that opinion is held by only a majority of jurors. In such case the jurors have been unable to agree unanimously. The legislative decision that it is only the unanimous jury recommen-

dation which should be given special consideration by the sentencing judge in a capital case rests upon at least two grounds. First, capital sentencing is a job for the judge. A jury may possibly be of assistance and aid to the judge, but the judge must make the final decision. Even when a jury unanimously recommends against the death sentence, the question of whether death is appropriate remains a judicial one. Second, there is the notion that the assistance and aid which is needed and beneficial to the proper functioning of the sentencing judge is that assistance and aid which is the product of a jury while operating at the same high level as required when rendering a verdict upon guilt or innocence. The basic values upon which the requirement of a unanimous jury recommendation rests are those values upon which rest the requirement of a unanimous jury verdict. Cf. *Burch v. Louisiana,* 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979). Those values are threatened if nonunanimous jury recommendations were required to be considered by the sentencing judge. When the capital sentencing roles of judge and jury are seen in this light, it is apparent that the requirement that the sentencing judge consider the jury recommendation need not apply in the absence of a unanimous juror viewpoint. We so hold.

### 14. Double Murder Aggravator

Pursuant to Ind.Code Ann. 35–50–2–9(b)(8), the prosecution alleged the multiple murder aggravator because appellant killed Theresa Blosl after having killed Charles Ervin. The trial court concluded that this aggravator had been proved beyond a reasonable doubt and placed "full and substantial weight of the highest level" upon it. The gravamen of this aggravator is the mind capable of repeatedly forming the intent to kill, each highly culpable mental state being accompanied by conduct resulting in repeated killings. *Baird v. State,* 604 N.E.2d 1170 (Ind.1992), *cert. denied,* 510 U.S. 893, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993).

Appellant complains that the two killings occurred in such rapid sequence that the trial court was not warranted in granting this aggravator the highest weight level. Amy

Foshee testified that she and Blosl were required to face the wall. Ervin was then grabbed and savagely stabbed multiple times. The blows and wounds spilling his blood were accompanied by a criminal intent directed at him. Blosl was then grabbed and savagely stabbed multiple times. The blows and wounds received by her were accompanied by an intent directed at her. Foshee was then attacked. Though the attack upon Blosl occurred moments after the attack upon Ervin, the attack upon Blosl and the accompanying intent to kill her occurred with the sure knowledge and realization of the nature and consequences of inflicting stabbing and cutting wounds upon a human being. As the trial court concluded:

> The fact that the Defendant was of such a character and attitude that he could endure the murder of one victim and move swiftly and intently to murder yet another is given considerable aggravating weight.

The trial court properly applied, considered, and gave weight to the multiple murder aggravator.

### 15. The Sentence

A judge in arriving at a sentence in a capital case should carefully weigh and evaluate evidence of mitigating circumstances. The judge should include a sensible description of the analysis of evidence in the sentencing order, together with the result reached as to the efficacy of the various items in the sentencing order. *Benirschke v. State,* 577 N.E.2d 576 (Ind.1991), *reh'g denied, cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Judge Emke's order reflects conformance with these requirements.

The defense presented evidence that appellant had adapted well during the three years awaiting trial on these charges and was never observed to be violent or disruptive. The trial judge gave "minimal weight" to this evidence. The judge gave moderate mitigating weight to fact that appellant was relatively free from misconduct from age 15 through age 21 when he killed. The trial court noted that appellant had been living alone for three years from age 18 to age 21. The trial court was not required to give additional mitigating

weight to appellant's age. The judge gave consideration to background deficiencies, recognizing appellant operated in the low to average intelligence level, and granted the factors moderate weight. No claim of mental retardation can be sustained on this record.

Appellant complains that the sentencing judge added weight to the killing of Charles Ervin on the basis that he had been tortured. The evidence showed that Ervin had been pommeled repeatedly and stabbed in the leg after the robbery had been completed. He received eight stab wounds, one of which penetrated through his neck. The trial court's conclusion is sufficiently supported.

The judge concluded that appellant's participation in light of his motive of revenge and his motive to avoid identification was greater than that of Michael Vance. The conclusion is also supported by the injuries sustained by appellant in the attack and his admissions. The judge did grant weight in the low range for the fact that appellant would have been likely to follow rather than to lead.

The Indiana Constitution requires this Court in all appeals from the imposition of the death penalty to determine whether the statutory procedures have been followed and whether the death penalty is appropriate. Review by this Court of every death sentence is automatic, mandatory, and cannot be waived. *Cooper v. State*, 540 N.E.2d 1216 (Ind.1989).

The trial court in this case meted out the death penalty for the conviction of appellant of Count VI, the intentional murder of Theresa Blosl. The trial court gave a sentence of sixty (60) years for the intentional killing of Charles Ervin. The trial court concluded that the prosecution proved beyond a reasonable doubt that appellant killed Theresa Blosl intentionally in the course of the robbery, the B(1) aggravator, and that appellant killed Theresa Blosl after having killed Charles Ervin, the B(8) multiple murder aggravator. The evidence manifestly proves both aggravating circumstances beyond a reasonable doubt.

The trial court declared in its written sentencing order, considered in some detail in the other sections of this opinion, that the two aggravating circumstances outweighed the mitigating circumstances with respect to the conviction for the intentional murder of Blosl. The trial court thoroughly considered mitigating factors, giving weight to the lack of a history of adult criminal conduct and only a minimal juvenile record, the aggressive role in the crimes of appellant's partner Mike Vance and his sentence of years, appellant's drinking and impulsive nature, his lack of an interested father, the death of his mother at age seven, the neglect and abuse at the hands of surrogate parents, his social, physical, and educational problems, and to other mitigating items. The trial court's findings with respect to mitigating circumstances are complete and we find that the weight of the aggravators, the intentional killing of Blosl after having taken the till from Ervin and killing him, outweighs the weight of the mitigators and that the imposition of the death penalty for the intentional murder of Blosl is appropriate.

### 16. Indiana Code 35–50–2–9

■ Appellant contends that the death sentencing process required by statute is unconstitutional under the Fifth and Eight Amendments to the U.S. Constitution because there is insufficient guidance to the sentencing judge as to what evidence should be received, what are aggravating and mitigating circumstances, and what the weighing and balancing of circumstances entails. He also claims that the process provides no "guarantee" of an appropriate decision.

■ The evidence to be received in a death sentence hearing is that which is relevant to charged death penalty statute aggravating circumstances and any mitigating circumstances. Aggravating circumstances are those enumerated in the statute and charged in the individual case. *Bivins*, 642 N.E.2d at 955. The weighing and balancing processes are the same judgmental processes applied by triers of fact operating under defined charges and defenses when judging the credibility of witnesses and the weight to be given to evidence and deciding upon guilt or innocence and an appropriate sentence.

Even where death statute procedures are scrupulously followed, this court on appeal may independently reweigh aggravating and mitigating circumstances to provide an assurance of consistency and fairness. *Bellmore, supra.* When the jury recommends that death not be imposed, and the judge nevertheless imposes death, the sentence will not stand unless the sentence is appropriate. *Roark v. State,* 644 N.E.2d 565 (Ind.1994), *reh'g denied.* The statute, like all statutes, is presumptively valid, and the burden is upon appellant as the challenger to demonstrate its unconstitutionality. The validity presumption has not been overcome. *Williams v. State,* 430 N.E.2d 759 (Ind.1982), *reh'g denied, cert. denied,* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982); *Fleenor v. State,* 514 N.E.2d 80 (Ind.1987), *reh'g denied, cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

### 17. Jury sequestration

On November 4, 1992 the jury selection process began. Over objection of the defense, the trial court ruled that sequestration of jurors would not be imposed at the point at which individual panel members passed through the challenge process, but would start when the entire jury was sworn. Selection was completed and the trial commenced on November 14, 1992.

In a capital case, the court must sequester the jury during the trial if there is a defense motion for it. *Lowery v. State,* 434 N.E.2d 868 (Ind.1982), *after re-trial,* 478 N.E.2d 1214, *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). A major purpose of the requirement is to prevent jurors under the stress of a capital trial from seeking or receiving the advise about and attitudes towards issues at the trial from persons with whom the juror will continue to live and work after the trial is over. Appellant argues that panel members who are selected and released before trial will be subject to those same mischievous influences and therefore should be sequestered upon selection. This question was settled in *Bellmore, supra.* An admonition from the trial judge not to view or listen to media coverage or discuss the case with others suffices during the pre-trial period. This is a sensible dividing line. There is some pressure on panel members as they learn the general issues in the case during voir dire examination, but that pressure builds once the trial commences and the specific issues are fleshed out, both for the jurors and for the public at large, and jury deliberations become imminent. The *Bellmore* holding is reaffirmed.

### 18. Voir dire of fourteen

Appellant claims that the trial court was in error in conducting the voir dire of a fourteen member panel of prospective jurors over his objection. He argues that the repetition of hypothetical questions assuming guilt or successful proof of a death aggravator desensitizes the individual members concerning major issues and even results in loss of neutrality. Similar concerns caused the California Supreme Court in exercise of its supervisory powers to require individual, sequestered voir dire in death penalty cases. *Hovey v. Superior Court,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).

The purpose of voir dire examination of prospective jurors is to discover whether a prospective juror has any opinion, belief, or bias which would effect or control her determination of the issues to be tried and thus provide the basis for exercise of the right of challenge. *Johnston v. State,* 239 Ind. 77, 155 N.E.2d 129 (1958). Voir dire examination is conducted under the supervision of the trial court and must of necessity be left to its sound discretion.

Under Indiana law, individual sequestered voir dire is not required in any case. However, the trial court retains discretion to structure voir dire to meet discrete circumstances. *Lowery v. State,* 547 N.E.2d 1046 (Ind.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). There were no such circumstances brought to the attention of the trial court in this case. The ruling of the court was not error. This court remains convinced that as yet there has been no convincing basis shown to support the requirement of mandatory individualized jury voir dire in capital cases.

### 19. *Caldwell* claim

The jury was informed during voir dire, in jury instructions, and during jury summation, that a sentencing decision reached by it, that death should or should not be imposed, was a recommendation. Appellant claims that the repetition of this information when considered with an erroneous statement in the jury instruction informing the jury on the subjects of parole eligibility; minimum and maximum sentences for murder, attempted murder, and robbery; consecutive and concurrent sentences; and good time credits; precludes the imposition of the death penalty because it so undermined the jury's sense of responsibility in making its sentence recommendation as to violate the Eight Amendment. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The instruction provided:

> The law states that a defendant will not be eligible for parole until he has served at least one half of any sentence.

> If you decide that death is not the appropriate penalty in this case, the sentencing will be in the Court's discretion. *The Court must then sentence Eric D. Holmes on the Murder convictions to a term of years.* The minimum sentence the Court could impose is thirty (30) years on each Murder conviction. The maximum sentence the Court could impose is sixty (60) years on each Murder conviction. The minimum sentence the Court could impose is twenty (20) years on the Attempted Murder and the maximum sentence the Court could impose is six (6) years on the Robbery and the maximum is twenty (20) years. These sentences could be ordered served consecutively or concurrently to each other. There is no way to predict at this point what sentence the Court might impose.

> In the State of Indiana, a defendant can earn credit for good behavior to apply against his sentence, with a maximum credit of fifty percent (50%) of the sentence imposed by the Court.

[Appellant's brief, p. 102–03] There was no *Caldwell* type objection to the instruction. The direct issue of whether it was error to give this instruction is not raised. *Jester v. State*, 551 N.E.2d 840 (Ind.1990). It is, of course, an incorrect statement of law to say that the court must give a term of years if the jury recommends against the death penalty. However, when couched within this particular instruction dealing with the subject of the length of potential sentences and other legal consequences, and when juxtaposed to other instructions more particularly and correctly dealing with the sentencing roles of the judge and jury, it does not constitute fundamental error.

In *Fleenor*, this court dealt in detail with a *Caldwell* claim of almost identical import and rejected it on the basis that the sense of responsibility of the jury had not been shown undermined. There, as here, the appellation "recommendation" was repeated time and again throughout the trial. It is not, however, error to inform the jury that its sentencing decision is a recommendation. *Lowery v. State*, 640 N.E.2d 1031 (Ind.1994), *reh'g denied*. If we assume that appellant's claim is made stronger by the presence of the misstatement in the above instruction, an error not present in *Fleenor*, we must at the same time recognize that appellant's claim is weakened by the trial judge's assertiveness in granting an order in limine preventing the use of the term "mere recommendation" which has the a more distinct propensity to undermine jury responsibility, a protective umbrella not present in *Fleenor*. In sum, we conclude that any dilution of the jury's sense of responsibility in its sentencing duties was not inconsistent with constitutional requirements.

### 20. Verdict form instructions

The trial court refused to give guilt phase special jury verdict forms on whether intent to kill was proved and on whether guilt was found on an accomplice theory. The court also refused to give separate penalty phase special jury verdict forms for each of the three death aggravators, each major category of mitigating evidence, the weighing of aggravators unanimously proved versus all mitigators found proved even by only one juror, and whether death by electrocution would be appropriate.

Special verdicts and interrogatories to the jury were abolished in Indiana in 1969 with the adoption of Indiana Trial Rule 49. The basis for this judgment was that the benefit of permitting the dissection of claims and defenses into constituent elements and requiring an individual assessment of each proved in practice to be far outweighed by the burden they place on the courts and the confusion which they injected into jury deliberations. With miniscule exception, their use has been eliminated. *See Criss v. State,* 512 N.E.2d 858 (Ind.1987) (prior felonies in habitual offender proceedings).

Appellant claims that the special verdicts were necessary to ensure his rights to have each juror determine his intent as an element of both the charges and the aggravators, and the weight of aggravators and mitigators, such right being claimed pursuant to Article 1, Sections 12, 16, and 19 of Indiana Constitution (trial by jury, prohibition against cruel and unusual punishment, jury as judge of law and facts, respectively).

The jury was properly instructed regarding the burden of the prosecution to prove the charged criminal states of mind at both phases of the jury part of the trial, and regarding the necessity of unanimous verdicts and recommendation. The authority to impose death belongs to the judge and not the jury and the judge is under a duty to provide written findings like the ones required of the jury by these rejected instructions, with mandatory review of the propriety of the death sentence by this court. No more is required by these constitutional provisions with respect to verdict forms than the requirement of complete and proper jury instructions and general verdicts.

### 21. The failure to recommend

Appellant contends that death sentencing statute is unconstitutional wherein it provides that if the jury cannot arrive at a recommendation, the jury drops out of the process and the judge alone decides the sentence. He relies on the right to trial by jury and the right to have the jury judge the law and facts. Ind. Const. art. I, §§ 13 and 19. He argues that the jury is required to play a role in sentencing. This claim has been decided against appellant's contentions. *Col-*

*lins v. State,* 275 Ind. 86, 415 N.E.2d 46 (1981), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); *Taylor v. State,* 420 N.E.2d 1231 (Ind.1981).

### 22. Penalty phase instruction 30

The trial court instructed the jury at the penalty phase, that if sentenced to a term of years, appellant would earn one half off of any sentence through credit for good time, and that multiple sentences may be ordered served concurrently. Logically therefore, the possibility existed, that appellant could earn release in fifteen years. Appellant claims that this fifteen years is unrealistic and would mislead the jury so as to recommend the death penalty contrary to the guarantees of Article 1, Sections 12, 16, and 19 of the Indiana Constitution and the Eighth Amendment to the U.S. Constitution.

The general rule in Indiana is that instructions such as this are impermissible because the jury fulfills no sentencing function. However, such instructions may be given in the discretion of the trial court where there is reason to believe that the jury will engage in speculation over the extent of alternative penalties. Such instructions must be complete and accurate. *See Fleenor, supra.* Here, defense counsel objected to this instruction on the basis that it did not accurately state the maximum sentences. Argument was held and resolved and may be deemed denied. Thus the claim raised on appeal was not made in a timely manner and preserved. *Jester,* 551 N.E.2d at 842.

The claim on appeal, moreover, ignores the learning process engaged in by a jury as a trial progresses, and also ignores the important role of the lawyers as opposing advocates in that learning process. Instructions such as these provide defense counsel the option of arguing that if the death sentence is not imposed it is highly likely that the sentencing court would impose a sentence of years in the high range indicated in the instruction. The prosecutor might then respond that the defendant would receive a sentence in the low range. A jury would realize that these are extreme views by opposing advocates, and that a better assessment would probably be somewhere in be-

tween, and that a meaningful assessment would be impossible for it. It is the purpose of the law permitting these instructions in exceptional circumstances, that armed with the knowledge of perimeters and the impact of future unknowable events, the jury will abandon speculation on the subject and restoration of the jury's proper office will occur. *See Feggins v. State,* 265 Ind. 674, 359 N.E.2d 517 (1977).

### 23. Article 1, Section 19 instruction

■ The trial court instructed the jurors that it was their right to decide the law, but to apply it as they found it and not to disregard it. It further advised that the court's instructions were the best source of the law. No issue was raised and preserved with respect to this instruction. Ind.Crim. R. 8. Appellant claims fundamental error in violation of the Sixth Amendment and multiple provisions of the Indiana Constitution.

■ There is no error. This instruction informs the jurors that they sit along with the court as judges to honestly, justly, and impartially interpret and apply existing law. *Beavers v. State,* 236 Ind. 549, 141 N.E.2d 118 (1957), *reh'g denied.* This judicial power does not include the right to create law or to reject law. *Burris v. State,* 218 Ind. 601, 34 N.E.2d 928 (1941). This is ever so evident when the instruction is considered in light of the law given in other instructions defining the proper office of the jury. The jury was told to consider any single instruction with all the other instructions. The challenged instruction and the concepts which it embodies shielded appellant's precious constitutional rights against encroachment.

### 24. Voluntariness instruction

■ Appellant tendered an instruction concerning the voluntariness of statements attributed to him by the evidence, which would include his statements "murder in the first degree" chanted while in custody. The instruction was refused.

Appellant relies upon *Grassmyer v. State,* 429 N.E.2d 248 (Ind.1981), *reh'g denied,* in which the evidence showed that the defendant was given a polygraph exam and subjected to further police interrogation during which he gave an incriminating statement admitted at trial against him. The trial court instructed the jury that although the court had determined admissibility of the statement, the jury was to consider the voluntariness of the statement for the purposes of ignoring it altogether or determining the weight and credit to which is was entitled. Unlike in *Grassmyer,* the evidentiary predicate for the issue of voluntariness is not present in the case at bar. While there was evidence that appellant was in custody during his statement, there is no evidence that the statement was the product of interrogation and thus there is no foundation for the voluntariness question. *Clemens v. State,* 610 N.E.2d 236 (Ind. 1993), *reh'g denied.* The jury therefore could not disregard the statement as in *Grassmyer,* but only determine the credibility of the police who sponsored it, and the weight to which the statement was justly entitled. That determination was adequately governed by the general instruction on weight and credibility. It was not error to refuse this instruction.

### 25. Mental state instruction

■ Appellant tendered the following instruction:

> The issue of the Defendant's mental state has been raised in this case. The evidence is offered to negate the Defendant's capacity to act knowingly or intentionally during and after the offenses which form the basis of the charges in this case. The State of Indiana has the burden of proving beyond a reasonable doubt that the defendant acted knowingly or intentionally for each offense that contains the element of knowing or intentional conduct.

[R. 768] This court employs a three part analysis in reviewing the denial of tendered instructions. First, the tendered instruction must correctly state the law. Second, it must be supported by the evidence. Third, it must not be covered by other instructions. *Pavey v. State,* 498 N.E.2d 1195 (Ind.1986). The instruction fails the first and third parts of the test.

■ This instruction is premised upon a diminished capacity defense theory. In Indiana there is no defense of diminished

capacity. *Cardine v. State,* 475 N.E.2d 696 (Ind.1985). This instruction is an erroneous statement of the law. If viewed simply as an instruction focusing the attention of the jury upon the evidence admitted at trial tending to show that a knowing or intentional state had not been formed, there would be no error in refusing it, as the issue of the sufficiency of evidence to support guilt is adequately covered by the instructions upon the elements of the charge and the requirement of proof beyond a reasonable doubt.

### 26. Jury instruction limitation

The trial court granted a defense motion to file more than ten instructions for the penalty phase, ten being the number set by Indiana Trial Rule 51. Twenty-five instructions were submitted, the trial court permitted eighteen instructions in all to be filed. Three were refused. Fifteen were given. Appellant claims the restriction violated constitutional rights guaranteed by the Eight Amendment and Article One of the Indiana Constitution. The claim is premised upon the general proposition that the issues at capital sentencing are unique and complex. There is no special claim of prejudice.

The rule is properly applied in criminal cases. *Harris v. State,* 262 Ind. 208, 314 N.E.2d 45 (1974), *reh'g denied.* The rule and its application here are eminently fair. The rule sanctions, and the trial court permitted, a discrete consideration of special circumstances warranting an exception. There is no undue restraint violative of constitutional imperatives.

### 27. Truthful testimony

The trial court twice instructed the jury, in part: "You should attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth." There was no issue raised and preserved with respect to this instruction. The claim is not presented. *Snider v. State,* 274 Ind. 401, 412 N.E.2d 230 (1980), *reh'g denied.* If presented, it would be rejected in accordance with the requirements of the doctrine of stare decisis. *Lottie v. State,* 273 Ind. 529, 406 N.E.2d 632 (Ind. 1980), *reh'g denied.*

### 28. Hearsay message

Over objection, the trial court admitted a written message penned by the victim Blosl as night shift manager. She left it in the restaurant for the day shift manager before exiting the restaurant with Ervin and Foshee and being attacked and killed. It was hand written on yellow legal pad paper and stated:

> Good Morning Suzie[,] Hope your feeling better/ tonight went smoth/ had some problems with Eric/ he gave Amy some problem[;] wanted to kick her ass. [T]hen he came back in later and wanted to do the same/ [H]e said he'd be in Sunday to bring his uniform in. [N]ot sure whats going on. Mary can't work/ she has to go to court[—] can you get someone to fill in[?]
>
> See ya at 200.
>
> Theresa
>
> p.s. I know the store could look better[.]

Appellant objected, contending that the exhibit was hearsay and violated his rights to confront and cross-examine. The trial court overruled the objection, ruling that the exhibit was hearsay admissible under the business records exception.

A business record as proof of facts is hearsay, admissible under an exception if (1) it is an original record, (2) it is made in regular course of business at or near the time of the events recorded, (3) it reports facts within first hand knowledge of someone who had a business duty to observe and report the facts, and (4) the witness who had first hand knowledge must be unavailable. *Wells v. State,* 254 Ind. 608, 261 N.E.2d 865 (1970); *Smith v. State,* 455 N.E.2d 606 (Ind.1983). It need be noted that under Ind. Evidence Rule 803(6), made effective after the trial of this case, there is no requirement of unavailability. Nevertheless, here even that requirement is met. The witness was the victim of the homicide charged and obviously not available. The remaining elements of the exception are satisfied. The State provided proof that the exhibit was a hand written original, made by a shift supervisor as part of her routine duties to ⸱inform the next shift supervisor of relevant events occurring under her supervision. The ruling of the trial court was not erroneous.

 Those accused of crime are guaranteed the rights of effective confrontation and cross-examination by our constitutions. Exceptions by which hearsay evidence may be lawfully admitted into evidence must be separately tested to determine whether their application is violative of those rights. *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Brady v. State,* 575 N.E.2d 981 (Ind.1991). The State must prove that a hearsay statement bears adequate indicia of reliability. Reliability may be inferred if a statement falls within a firmly rooted hearsay exception or in the event the hearsay exception warrants admission, but if the exception fails to qualify as firmly rooted, the State must show "particularized guarantees of trustworthiness" which include "only the circumstances surrounding the making of the statement and that render the declarant particularly worthy of belief". *Wright,* 497 U.S. at 819, 110 S.Ct. at 3148.

Assuming arguendo that the business records exception is not a firmly rooted hearsay exception, we find the statement and the circumstances under which it was made render the declarant Blosl particularly worthy of belief. The exhibit is a record of a small restaurant business which describes routine personnel and operational matters. Several different subjects are touched upon in the broadest of terms. The portion relevant to the trial of this case describes an argument between two employees and the fact that one was hostile towards the other. The record was made by a shift manager and supervisor, to whom the event would not have been a happy one, yet the message does not evince an accusatory or rancorous intent toward either of the employees involved. The record was written at the end of the shift during which the argument had taken place, when the recollection of the supervisor would have been fresh and before the crimes occurred. Face to face cross examination of Blosl would not have added appreciably to the reliability of the facts related, namely, that an argument had occurred between appellant and Foshee, and that appellant was hostile. Under the totality of the circumstances, the admission of this hearsay exhibit upon a fully proper application of the business records exception was consistent with both the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution.

### 29. The robbery conviction

The jury returned a verdict of guilty of Robbery Class A, the enhancement to Class A being based upon the element of the knife wounds to Charles Ervin, the same injury being the basis for the murder conviction. The same injury to Ervin as found by the jury would constitute the basis for an enhancement to Class B. The appellant is correct that he is entitled to resentencing on the robbery count as a Class C felony. *Bevill v. State,* 472 N.E.2d 1247 (Ind.1985), *reh'g denied.*

### 30. The conspiracy conviction

 The jury returned a verdict of guilty of Conspiracy To Commit Robbery, the robbery of Charles Ervin itself constituting the overt act element. Appellant is correct that under these circumstances, where no additional facts would be required to prove the murder charge beyond those necessary to prove conspiracy, vacation of the conspiracy conviction is necessitated by the principles of double jeopardy. *Neal v. State,* 659 N.E.2d 122 (Ind.1995); *Buie v. State,* 633 N.E.2d 250 (Ind.1994), reh'g denied.

### 31. Jury qualification

Appellant claims that the the process in Indiana, questioning by the court and counsel, by which a jury is qualified to serve in a capital case, renders a jury more likely to convict of the crime and to recommend in favor of the death penalty. This facial challenge to the death sentence statute as inconsistent with the right to a fair and impartial jury trial on the question of guilt or innocence of the charged crimes, has been fully considered and rejected. *Utley v.State,* 589 N.E.2d 232 (Ind.1992), *cert. denied,* 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993).

### 32. Constitutionality

It remains to consider contentions that challenge the death sentence statute because of repugnancy to the Constitution supposed to result from some of its provisions.

 We are of the opinion that the statute is not unconstitutional per se as being

cruel and unusual punishment. *Smith v. State*, 465 N.E.2d 1105 (Ind.1984). The prosecutorial discretion to bring the count seeking the death penalty does not alter this opinion. *Fleenor v. State*, 514 N.E.2d 80 (Ind.1987), *reh'g denied, cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). The question of whether the statute is void because of the role assigned to the jury in the sentencing process has been resolved and may be disposed of here by citation of authority. *Canaan v. State*, 541 N.E.2d 894 (Ind.1989), *reh'g denied*, cert. denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 185 (1990). A like conclusion also adversely disposes of claims based upon jury consideration of appropriate sentences for years, jury consideration of guilt phase evidence, jury unanimity, order of closing argument, burden of proof, and proportionality. *Brewer v. State*, 275 Ind. 338, 417 N.E.2d 889 (1981), *reh'g denied, cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982), 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403 (1982); *Miller v. State*, 623 N.E.2d 403 (Ind. 1993), *reh'g denied; Bivins v. State*, 642 N.E.2d 928 (Ind.1994), *reh'g denied; Roche v. State*, 596 N.E.2d 896 (Ind.1992). And we pass the claim challenging the statute's provisions for considering the extent of the defendant's criminal history and the extent of any extreme mental disturbance as perceived by the defendant. We also pass the claim that the statute is faulty because it contains no requirement for special verdicts. The unsoundness of these claims against the statute is too apparent to require us to do more than the broad avenue open under the statute to all relevant mitigating evidence and to the lack of cited authority.

### 33. Indiana Code 35–50–2–9(g)

Appellant claims a repugnancy to the Eighth and Fourteenth Amendments wherein I.C. 35–50–2–9(g) uses the term "shall." Ind.Code Ann. 35–50–2–9(g) (West Supp. 1995). He argues that the term unconstitutionally mandates the imposition of death by the sentencing judge when the judge, following a failure of the jury to make a recommendation, determines that aggravators outweigh mitigators. This claim was rejected by this court in *Burris v. State*, 642 N.E.2d 961(Ind.1994), *reh'g denied.*

### 34. Waiver Doctrine

Appellant urges as a general matter, unrelated to any specific claim on appeal, that this Court should re-examine its waiver doctrine in direct appeals and post-conviction cases and permit capital defendants to present serious legal arguments overlooked by trial counsel. We pass this claim, noting only that no allegation of trial court error is made, which if substantiated would warrant appellate relief.

The sentence of death is affirmed. The conviction for conspiracy to commit robbery is ordered vacated. The sentence for Robbery, Class A is ordered set aside and a new sentence for Robbery, Class C is ordered imposed in its stead. The remaining convictions and sentences are affirmed.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

SELBY, J., concurs with separate opinion.

SELBY, Justice, concurring.

I concur in the opinion. I feel it necessary, however, to comment on penalty phase instruction 30. At trial, Defendant objected to this instruction on the basis that it did not accurately state the maximum sentences. Following this objection, the trial judge amended the instruction to include both the maximum and minimum sentences which were possible for each count. The instruction further advised that the sentences could be concurrent or consecutive, and the sentence could by reduced by a maximum of fifty percent for good behavior. From this information, the jury could determine that the minimum possible prison time would be fifteen years.

Now, Defendant appeals on the basis that a fifteen year prison term is unrealistic and such an instruction would mislead the jury so as to recommend the death penalty. Since Defendant appeals on a different ground than raised at trial, I agree with the majority that Defendant has not properly preserved this issue for appeal. *Jester v. State*, 551 N.E.2d 840 (Ind.1990).

Nevertheless, there is a danger that such an instruction can lead to jury speculation, and should only be used when the trial judge has reason to believe that the jury would otherwise engage in speculation over the extent of alternative penalties. When speculation is inevitable, it is appropriate for the trial judge to give the jury complete and accurate information. *Fleenor v. State*, 622 N.E.2d 140 (Ind.1993). However, if jurors were to fixate on the minimum possible sentence, they may be inclined to recommend death in order to avoid a relatively short prison term.

In the present case, the trial judge was careful to present an accurate instruction which provided the maximum and minimum possible sentences, without giving any indication of what the likely sentence may be. The instruction itself did not lead the jury to conclude that they were choosing between death and a fifteen year sentence.

The trial judge does have the discretion to offer such an instruction if it is clear that the jury would be engaging in speculation. However, it is my view that such instructions can themselves invite speculation and should be used with care.