Jimmie A. BATALIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A04–0712–CR–666.

Court of Appeals of Indiana.

May 27, 2008.

Transfer Denied July 17, 2008.

Thomas W. Vanes, Office of the Public Defender, Crown Point, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Jimmie A. Batalis appeals his convictions of murder and attempted murder. Batalis argues the trial court erred by submitting special verdict forms to the jury and he cannot be convicted of both murder and attempted murder. The State concedes he cannot be convicted of both offenses, and we vacate his conviction of attempted murder. Finding no reversible error in the submission of the special verdict forms, we affirm his conviction of murder.

### FACTS AND PROCEDURAL HISTORY

Dianna De St. Jean started dating Batalis in April 2001. About a year later, De St. Jean wanted to break up. Batalis did not want the relationship to end; he fluctuated between being angry with De St. Jean and trying to bargain with her. De St. Jean attempted to terminate the relationship six to eight times before she finally succeeded early in 2003. Batalis continued to call her and also had friends call on his behalf.

De St. Jean began dating Jason Nosker. One evening, Batalis called De St. Jean and told her if she did not stop seeing Nosker, he "would do something" to Nosker. (Tr. at 109.) Sometimes when De St. Jean was at Nosker's house, they would receive phone calls from a "private number," and shortly thereafter, Batalis would drive by in his truck. (*Id.* at 113.)

Nosker received threats from Batalis. Eventually, Nosker called Batalis and asked, "[W]hat can we do to just end this?" (*Id.* at 573.) Batalis told him to stop seeing De St. Jean. Batalis claimed Nosker "disrespected him" by not asking his permission to date De St. Jean. (*Id.*) Batalis said, "I know some n* * * * *s in Gary

who will come and take care of you," and "You will never see me coming." (*Id.* at 573–74.)

During the day on May 1, 2003, Robert Valdivia had gone to the gas station where Anthony Burton worked. Valdivia was driving a minivan owned by Batalis' father. Valdivia took a gun out of the van and showed it to Burton. Valdivia claimed he did not know the gun was in the minivan until he braked and the gun slid out and hit his foot.

That evening, Nosker, De St. Jean, and Burton were drinking at Nosker's house. Burton received a phone call from Valdivia, who wanted him to come to the Main Street Station bar. Nosker and De St. Jean wanted to go to the End Zone bar. Burton was underage, so he went home, and Nosker and De St. Jean went to End Zone. They returned early in the morning, and Nosker went straight to bed. De St. Jean took a sleeping pill and eventually fell asleep on the couch.

While Valdivia was at the Main Street Station bar with Batalis, Batalis said "he didn't like [Nosker] that much" and he "wanted to go ... beat him up." (*Id.* at 224.) Batalis wanted Valdivia to come with him and knock on the door because he did not think Nosker would open the door for him. Batalis drove them to Nosker's house in the minivan. Valdivia did not know Nosker or De St. Jean personally and did not know where Nosker lived.

As Valdivia was about to knock on Nosker's door, Batalis tapped on a window and fired two or three shots. Valdivia and Batalis ran away. Valdivia asked "what the hell was that all about," and Batalis told him "to just shut up." (*Id.* at 233.) Valdivia claimed he did not have a weapon and did not know Batalis had taken the gun from the minivan.

Nosker and De St. Jean were asleep and did not hear or see anything prior to the shooting. Nosker realized he could not move his legs and called his mother. His mother told him to call 911 and then call her back. De St. Jean did not wake up until the police arrived.

Officers Jay Bailey and Mike Webber were dispatched to Nosker's house. They found bullet holes in the window of Nosker's bedroom and two shell casings outside. Paramedics found gunshot wounds in Nosker's back. He was taken to the hospital, where he underwent surgery. Nosker was paralyzed from the waist down. He later died of complications of his injuries.

Detective Stephen Houck investigated the shooting and contacted Batalis on May 2. Detective Houck gave Batalis *Miranda* warnings, then asked Batalis where he had been the evening of May 1. Batalis said he had been at the Main Street Station until 10:30 p.m., then went to Michael Simmons' house. He claimed he was at Simmons' house until 1:00 a.m., then went home and played cards until 3:30 a.m. He read until 4:00 a.m., when he went to sleep. He did not mention being with Valdivia. Simmons confirmed Batalis had been at his home from 12:00 midnight to 1:00 a.m., but Detective Houck could not confirm the rest of Batalis' story.

Burton later told Detective Houck he had seen Valdivia with a 9–millimeter gun. Detective Houck contacted Valdivia, who admitted going with Batalis to Nosker's house. Valdivia said he thought they were "going to go kick some butt," but Batalis pulled out a weapon and fired. (*Id.* at 329.)

On September 15, 2004, the State charged Batalis with attempted murder and two counts of battery. That day, Batalis gave a second statement. He said he had heard Nosker had been "involved with

a drug deal gone bad." (*Id.* at 473.) He claimed Nosker had been shot either by a drug dealer or by Valdivia "as a favor for him." (*Id.*) When he was confronted with Valdivia's statement, Batalis admitted driving with him to Nosker's house. He claimed he stayed in the minivan and Valdivia left for five minutes. When Valdivia returned, he said he had shot Nosker. Batalis told the police the gun was now at his brother Peter's house.

A 9–millimeter gun was found in Peter Batalis' house. The shell casings found at the scene of the crime had come from that gun. Burton identified the gun as the one Valdivia had shown him. While they were dating, Batalis had shown De St. Jean his gun and explained to her how a gun could be linked to a crime. Batalis told her his gun would never be linked to a crime because he would melt it down. Part of the barrel of the gun had been melted.

After Nosker died, the State amended the information to add count IV, murder. The case was tried to a jury on February 23, 2007 through March 1, 2007. The trial court instructed the jury on accomplice liability with respect to all four charges. Unbeknownst to the State and Batalis, the trial court gave the jury two sets of guilty verdict forms: one set stated he was guilty of the offenses, and the other specified he was guilty as an accomplice. The jury left the accomplice liability forms blank and returned a general verdict on all four counts. The trial court entered convictions of murder and attempted murder. Batalis was given concurrent sentences of fifty-seven years and thirty-seven years, respectively.

## DISCUSSION AND DECISION

■ Batalis argues the trial court erred by giving the jury special verdict forms. Special verdicts and interrogatories to the jury have been abolished. Ind. Trial Rule 49. The State agrees with Batalis' characterization of the forms as special verdict forms,[1] but asserts their use was harmless error.

■ "An error is not ground for setting aside a conviction unless such error affects the substantial rights of the parties." *Boone v. State,* 728 N.E.2d 135, 139 (Ind.2000), *reh'g denied; see also* T.R. 61. The harmless error test focuses on the probable impact of the error on the jury. *Griffin v. State,* 664 N.E.2d 373, 376 (Ind. Ct.App.1996). A conviction will not be reversed if the State can demonstrate beyond a reasonable doubt the error did not contribute to the verdict obtained. *Spivey v. State,* 761 N.E.2d 831, 836 (Ind.2002).

We find the use of special verdict forms was harmless. The forms did not remove any issues from the jury. The jury was asked to distinguish between liability as a principal and an accomplice, but that distinction has no practical consequence. *See*

1. In fact, there appears to be conflicting authority as to whether the verdict forms used in this case were special verdict forms. *See Denton v. State,* 496 N.E.2d 576, 582 (Ind. 1986) (in one of the first cases to interpret T.R. 49, our Supreme Court held a verdict form that asked whether the State proved Denton had certain previous felony convictions, whether he had accumulated two or more unrelated felony convictions, and whether he was an habitual offender was not a special verdict form because the jury decided all the issues, leaving nothing for the court to determine); *cf. Holmes v. State,* 671 N.E.2d 841, 855–56 (Ind.1996) (rejecting argument that trial court should have given jury verdict forms specifying whether intent to kill was proved and whether accomplice liability was proved, because these would be special verdicts in violation of T.R. 49, and characterizing habitual offender cases as an exception to T.R. 49). As the State does not argue the forms used in Batalis' case were not special verdict forms, we will assume without deciding the forms were special verdict forms.

*McQueen v. State,* 711 N.E.2d 503, 506 (Ind.1999) (there is no distinction between the criminal responsibility of a principal and an accomplice; one may be charged as a principal and convicted as an accomplice).

Batalis argues the separate forms confused the jury, pointing to the following question asked by the jury: "If we agree that J. Batalis aided or induced, are we indicating that the state proved that Robert Valdivia committed the crime and not Jimmie Batalis[?]" (Tr. at 742.) The question evidences some confusion about accomplice liability, but the jurors ultimately found Batalis was the principal.

That verdict was supported by ample evidence. Batalis resisted De St. Jean's attempts to break up with him. He continued to call her after she ended the relationship. He threatened Nosker on several occasions. Valdivia was also at the scene of the crime, but he did not know De St. Jean or Nosker. He testified he was not armed and did not know Batalis was armed. The gun used to shoot Nosker was the one Valdivia had found in the minivan they drove to Nosker's house. After giving several inconsistent statements, Batalis told the police where the gun was. It had been partially melted, just as Batalis had said he would do to prevent the gun from being linked to a crime.

Batalis argues the separate forms reinforced the State's argument that Batalis could be convicted whether or not the jury believed Batalis was the shooter. In light of the overwhelming evidence of Batalis' guilt, we cannot say the separate forms likely had any significant impact on the jury. *See Swann v. State,* 789 N.E.2d 1020, 1024 (Ind.Ct.App.2003) (error is harmless if evidence of guilt is overwhelming and defendant was allowed to present

his defense), *trans. denied* 804 N.E.2d 747 (Ind.2003).

 The State concedes Batalis cannot be convicted of both murder and attempted murder. *See* Ind.Code § 35–41–5–3(b) ("A person may not be convicted of both a crime and an attempt to commit the same crime.") Therefore, we vacate his conviction of attempted murder. Because the use of special verdict forms was harmless, we affirm his conviction of murder.

Vacated in part and affirmed in part.

VAIDIK, J., and MATHIAS, J., concur.